2010 FEB 26  PM 3: 53

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

ARBORIS, LLC,
a Delaware limited liability company

      Plaintiff,

CASE NO: 3:10-CV-179-J-25TEM

v.

**JURY TRIAL DEMANDED**

ARIZONA CHEMICAL COMPANY,
a Delaware corporation,
ARIZONA ARBORIS, INC.,
a Delaware corporation,

      Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Arboris, LLC ("Arboris") sues Defendants, Arizona Chemical Company ("Arizona") and Arizona Arboris, Inc. ("Arizona-Arboris") and states:

### INTRODUCTION

1.    Defendants, Arizona and Arizona-Arboris, are taking concerted, unfair and anticompetitive action to destroy Arboris, a young company that has reached annual sales of fifty million dollars of "phytosterols" made from a tree chemical used in cholesterol-reducing drugs and heart healthy foods.

2.    On the face of it, this would appear hard to understand because Arboris is a joint venture company in which Arizona itself holds a ten percent minority ownership interest through its wholly owned subsidiary, Arizona-Arboris. Moreover, Arizona has profited substantially from Arboris' success since its initial operations began in 2004.

1

3.     The reason for the Defendants' wrongful conduct is simple.  Arizona has seen Arboris' success and wants to take the business for itself.  Arizona is Arboris' exclusive supplier of the raw material ("Tall Oil Pitch" or "TOP") that Arboris needs to manufacture phytosterols.  Indeed, because Arizona controls nearly half the world supply of TOP, Arizona itself has always been a natural competitor in the phytosterols market – but for one problem.  Arizona failed in its own attempts to acquire and develop cost effective manufacturing technology to manufacture phytosterols, whereas Arboris was able to obtain a state of the art technology to do so.

4.     Having failed to acquire the technology necessary to produce TOP-derived phytosterols, in 2001 Arizona leveraged its dominant raw material position to negotiate a ten percent ownership position in the Arboris joint venture, without investing any capital.  While the express intent of the Arboris joint venture was for it to proceed for a period of at least 30 years, now that Arboris has achieved manufacturing and economic success, Arizona and Arizona-Arboris intend to destroy Arboris just 10 years from the time it became operational.

5.     To accomplish this, the Defendants are together and in bad faith taking unjustifiable positions under the TOP supply agreement (the "TOPSA") and a ground lease to claim that Arizona can arbitrarily refuse to renew the TOPSA and upon its expiration in 2014 can cut off Arboris' supply of raw material, oust it from its manufacturing facility, and acquire all of its physical assets for negligible cost.  This is despite the mandate in Arboris' Operating Agreement that the joint venture is to proceed for a period of **30 years**.

6.     When Arboris became aware of the Defendants' position in 2009, it first undertook repeated attempts to have the Defendants repudiate their position.  Being rebuffed,

2

Arboris then sought non-judicial solutions, including exploratory efforts to build or purchase an alternate facility, to diversify its product offerings, or to contract manufacturing to other locations.   Arizona-Arboris (the ten percent owner of Arboris), reacted by vetoing and threatening to continue vetoing such efforts by Arboris to save itself from the Defendants' plan of destruction, in blatant violation of its fiduciary duties to Arboris.

7.    And finally, to perfect their plan to take the business for themselves, the Defendants have also undertaken to misappropriate and misuse Arboris' intellectual property and technology.

8.    Arboris now brings this suit against the Defendants for injunctive and declaratory relief and damages.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 2, 18, 26, and 28 U.S.C. §§ 1331, 1337.  Additionally, as Plaintiff is seeking a declaration with respect to its rights and legal relations *vis-à-vis* the Defendants and the controversy described herein, this action is additionally brought pursuant to 28 U.S.C. § 2201.

10.    Venue is proper in this Court pursuant to the agreements of the parties and pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391.

## THE PARTIES

11.    Arboris is a Delaware limited liability company with its principal place of business in Jacksonville, Florida. Arboris is the world's leading manufacturer and marketer of non-genetically modified phytosterols ("non-GMO phytosterols") and operates a

phytosterol extraction plant in Savannah, Georgia and a phytosterol purification plant in Newark, Ohio.

12.     Arizona is a Delaware corporation that resides in Jacksonville, Florida, has ten manufacturing locations in the US and in Europe and does business in most countries of the world.

13.     Arizona-Arboris is a Delaware corporation, and is a wholly owned subsidiary of Arizona Chemical with no dedicated staff, no manufacturing locations, and no business other than with Arboris and with its parent. Arizona-Arboris' principal place of business is in Jacksonville, Florida.

## FACTS PERTAINING TO ALL CAUSES OF ACTION

### Pre-2001: Arizona Attempts but Fails To Develop Economically Viable Technology to Enter the "Non-GMO Phytosterols" Market

14.     Arizona's business is the manufacture of chemicals from raw materials generated during the pulping of pine trees, and particularly crude tall oil ("CTO"). The primary business of Arizona is based upon the chemical upgrading of organic acids contained in the CTO. The waste from a CTO chemical manufacturing process like Arizona's is a substance known as "Tall Oil Pitch" or "TOP."

15.     Prior to 2002, Arizona typically sold its TOP, a combustible substance, to third parties as inexpensive fuel. Over many years, companies in the U.S. and in Europe, Arizona included, made attempts to derive value from TOP by trying, among other things, to render from it certain valuable chemical substances known as "phytosterols." Phytosterols, which have cholesterol-lowering qualities, can be used in a number of applications including pharmaceuticals, food products, dietary supplements and cosmetics.

16.     Phytosterols are not only derived from TOP. They can also be produced from byproducts of soy bean and rapeseed oil refining. TOP-derived phytosterols are valuable in that they are not genetically modified, whereas soy-derived phytosterols are genetically modified. A differentiated market exists for such "non-GMO" phytosterols (the "Non-GMO Phytosterols Market"). For instance, throughout the European Union, genetically modified phytosterols are banned from food and pharmaceutical applications. Customers of Arboris who purchase and sell phytosterols to food product and pharmaceutical manufacturers whose consumer products are to be sold in Europe must, by regulation, use non-GMO phytosterols, such as those derived from TOP. The non-GMO phytosterols market is desirable because non-GMO phytosterols typically command a higher price and serve different functions than genetically modified phytosterols.

17.     Because of the great potential profits to be made from pine-derived non-GMO phytosterols, between 1994 and 1997 Arizona licensed a non-GMO phytosterol technology from a Swedish consortium known as Triple Crown and produced pilot quantities of non-GMO phytosterols at its Panama City, Florida location. During this time, Arizona made commercial proposals to sell it non-GMO phytosterols to Upjohn, a pharmaceutical user.

18.     However, Arizona's efforts using the Triple Crown technology failed due to the high cost of the extraction chemicals and difficulty of achieving competitive quality standards. The phytosterols Arizona produced using the Triple Crown technology were only suitable for low grade raw material for certain pharmaceutical processes. Around 1997 or 1998 Arizona allowed the Triple Crown license to lapse.

19.     Although it wanted to enter the non-GMO phytosterols market, Arizona was not able to independently develop that business. Thus, prior to the Arboris operation, TOP was primarily a low margin product for Arizona sold for its fuel value.

### 2001: Härting Develops Economically Viable
### Technology for the Production of Non-GMO Phytosterols

20.     In 2001, a Chilean businessman and inventor named Thomas Härting developed and patented a unique chemical process (the "Härting Sterol Process") and demonstrated and validated the process at a semi-commercial scale pilot plant. The Härting Sterol Process resolved a number of the technical and economic obstacles that Arizona and others had faced. This created a new and potentially lucrative use for TOP.

21.     Following development of the Härting Sterol Process, Härting began exploring the potential formation of a business to manufacture and market non-GMO phytosterols. To form such a business, Härting needed a sufficient, steady supply of TOP.

### Arizona Leverages its Control over TOP
### to Acquire a Minority Ownership Interest in Härting's
### New Venture and Gain Access to the Arboris Technology

22.     Härting's choices for a TOP supplier were few. The worldwide market for the supply of TOP for the production of non-GMO phytosterols is oligopolistic and highly concentrated. Härting initially explored a Chilean based joint venture with non-GMO phytosterol customers, but the availability of Chilean CTO, and thus TOP, was insufficient. Currently, only four companies in the world produce TOP in quantities sufficient to supply an economic scale non-GMO phytosterols operation. Those four companies are MeadWestvaco Corporation ("MWV"), Georgia Pacific Corporation ("GP"), Forchem Oy

6

("Forchem") and Arizona. Of the four, Arizona controls most of the world-wide production, with 47% of the aggregate TOP production.

23.     Knowing that Arizona controlled most of the worldwide supply of TOP in 2001 and 2002 and that that situation was not likely to change, Härting engaged in discussions with Arizona about Arizona supplying his new business with TOP.

24.     However, when Arizona learned of Härting's new cost-efficient technology, the advanced stage of Härting's negotiations for take-or-pay contracts with two large potential customers, and consequently the potentially lucrative new market to be created from its heretofore cheap and abundant waste byproduct, Arizona was no longer interested in merely selling its TOP to Härting at the going market (fuel) rate.

25.     While Arizona had neither the intellectual property, the specialized facility required to extract phytosterols from TOP, nor potential contracts with customers willing to enter into long term supply agreements, what it possessed was great market control over the supply of TOP, and it wanted to join in the potential profits of this new phytosterols market.

26.     Arizona clearly appreciated the potential added value the Harting Sterol Process could bring to its formerly low-value TOP.  Additionally, knowing its own ability to wield control over the worldwide supply of TOP, Arizona would not settle for a simple supply agreement.   Instead, in exchange for agreeing to supply TOP to Härting, thus addressing the raw material vulnerability, Arizona devised a "joint venture" between Härting and Arizona to manufacture and market non-GMO phytosterols.  The venture would become Arboris, LLC.

27.     Unfortunately, while Arizona spoke in terms of a "joint venture," Arboris has recently discovered Arizona's hidden intent for obtaining an ownership interest in Arboris was only so it could gain access to Arboris' technology, misappropriate it, cut off its supply of TOP, and then enter the non-GMO phytosterols market itself, as it had tried unsuccessfully to do for years.

28.     A former Arizona insider has recently reported that throughout the Defendants' relationship with Arboris, Arizona's president, Gerald Marterer, internally expressed that it was Arizona's true intent to "starve" Arboris of its raw material supply and to soon enter the non-GMO phytosterols business itself, without Arboris.

## July 5, 2001: Arboris Joint Venture is Formed

29.     Based on Arizona's representations of interest in a long-term joint venture, on July 5, 2001, Arboris was formed.  Its original members were Arboris Roots Corporation ("Arboris Roots," Härting's affiliate) and Arizona-Arboris (Arizona's wholly-owned subsidary).

30.     Between July 5, 2001 and July 30, 2002 the parameters of the joint venture were discussed and agreed upon.  The venture was to be for a lengthy term – to proceed for a period of 30 years.  In this regard, Arizona-Arboris would provide Arboris a 30 year lease rent free of vacant land owned by Arizona (adjacent to Arizona's facility) on which Arboris could build its plant.  In turn Arizona-Arboris executed a mirror lease with its parent.

31.     In exchange for these limited contributions, Arizona-Arboris would acquire a ten percent minority ownership interest in Arboris and assume a seat on Arboris' Board of Managers.  Arizona-Arboris would make no capital contributions to Arboris nor undertake

any other risk. Arizona also required that it exclusively supply all of Arboris' TOP requirements.

32.     In contrast to the minimal contributions by Arizona and Arizona-Arboris, Härting's affiliate, Arboris Roots, would assume all of the capital, technology and market risk and would own 90% of the shares in Arboris.[1] Arboris Roots alone would finance the capital investment (approximately $65 million) to build and equip a state-of-the-art phytosterol extraction plant at Savannah (the "Arboris Plant"), and a phytosterol purification plant at Newark Ohio. Arboris would pay Arizona-Arboris for the contract operation of the plant, which Arizona-Arboris subcontracted to Arizona.

33.     With regard to the proposed exclusive supply agreement between Arboris and Arizona (which ultimately became the TOPSA), Arizona was to derive extraordinary profit. Arizona would supply TOP to Arboris from its North American plants but would never relinquish ownership of the TOP to Arboris. Arboris would be obligated to (i) return to Arizona the TOP remaining after the extraction of the phytosterols (about 90% of the incoming TOP) and (ii) pay Arizona for the 10% retained volume of TOP in an amount three times the 2002 fuel value price.

### July 30, 2002: Arboris Agreements Confirm and Establish a Long Term 30 Year Joint Venture

34.     Approximately a year following formation of the Arboris joint venture, Arboris, Arizona, and Arizona-Arboris entered into a series of written agreements relating to Arboris. These agreements are herein referred to collectively as the "Arboris Agreements"

---

[1] Presently, Arboris Roots owns 60% of the membership units in Arboris, while another Härting affiliate, "Arboris Leaves," owns 30% of the membership units.

and included, among others a "Contribution Agreement" (**Exhibit A**); an Operating

Agreement (**Exhibit B**); a "Supply and Processing Agreement" or "TOPSA" (**Exhibit C**); a

"Contract Operations Agreement" (**Exhibit D**); and a "Ground Lease" (**Exhibit E**).

35.     Consistent with the members' prior agreement, the stated purpose of the

Arboris joint venture was for it to operate a phytosterols extraction and purification plant in

Savannah Georgia and to sell its phytosterols for a long term period of at least 30 years.

36.     The Operating Agreement expressly mandated a 30 year venture, stating that

the "Term of the Company ***shall...continue*** until dissolved upon the occurrence of an event

set forth in Section 9.1," which paragraph establishes that the term is to be "***Thirty (30) years***

from the date hereof" unless earlier dissolved by (i) "the happening of any event of

dissolution specified in the Certificate of Formation" (which document specified no

dissolution events); (ii) "the entry of a decree of judicial dissolution" pursuant to Delaware

law, or (iii) "the vote of all the Members."

37.     Consistent with the 30 year duration for the joint venture, the Ground Lease

also logically had a 30 year term so that during the term of the joint venture Arboris would

always have a plant site on which it could operate its phytosterols business.

### 2004 to Present: Arboris is Profitable and
### Captures a Large Share of the Non-GMO Phytosterols Market

38.     By mid-2004, Arboris was fully operational.   Despite the high premium

Arboris was paying Arizona for its TOP, Arboris was nevertheless very profitable.  As of late

2009, Arboris was able to overcome risks and deliver on its business model.  It has captured

approximately 60% of the world non-GMO phytosterols market (80% of the TOP derived

non-GMO phytosterols) and approximately 35% of the world phytosterols market overall.

39.     Due to Arboris' success, Arizona has also profited handsomely from the terms of the TOPSA.  From the beginning of operations in mid 2004 through the end of calendar year 2009, Arboris paid Arizona approximately $29 million in TOP fees, which includes approximately $25MM of premium over the market (fuel) value of TOP.

## 2009: Arboris Seeks to Renew the TOPSA but Arizona Refuses to Negotiate

40.     With the business transitioning to a stable mode, delivering $20-25 million per year including royalties, fees and EBITDA, in 2009 Arboris sought to renew the TOPSA and renegotiate the price it was paying for TOP.

41.     Although the Operating Agreement expressly required that the joint venture would proceed for 30 years and the Ground Lease term was also 30 years, the TOPSA's initial term was only 10 years but expressly called for renegotiation and multiple renewals on a more frequent basis.  The purpose of the shorter initial term of the TOPSA with frequent renewals was to permit the parties to renegotiate and reset the TOP price to keep it relative to market prices and conditions.

42.     Accordingly, in 2009 Arboris approached Arizona several times to renegotiate and renew the TOPSA.  With the significant return on investment Arizona was realizing under the TOPSA, Arboris expected that Arizona would be eager to lock in a favorable price for TOP going forward.  However, this was not the case.

43.     On June 16, 2009, at an Arboris Board of Managers meeting, Arboris' executive vice president, Manuel Canales brought up the subject of renegotiating the price of TOP and renewing the TOPSA.  Kees Verhaar, Arizona-Arboris' representative on Arboris' Board of Managers and also the President and Chief Executive Officer of Arizona, stated that

the TOPSA did not end until July 2014 and that Arizona would not even begin negotiating the terms of the TOPSA until mid 2012. Arboris repeatedly informed Arizona and Arizona-Arboris that the current refusal to negotiate and renew the TOPSA was damaging Arboris' ability to make long term plans and commitments. Arizona refused to respond.

44.     Because the refusal to negotiate was damaging Arboris' ability to make future plans, Arboris made multiple additional attempts to renegotiate the TOPSA with Arizona throughout the remainder of 2009 and early 2010. However, each attempt to renegotiate was rebuffed by Arizona and Arizona-Arboris, which continued to contend it was "too early" to renegotiate despite the contractual requirement to do so. In discussions between Mr. Verhaar of Arizona and Mr. Canales of Arboris during the third quarter of 2009, Mr. Canales repeatedly requested a time and venue for "businessman and legal counsel level discussions" regarding revision of the TOPSA terms and conditions. Arizona did not respond to those requests.

45.     Arboris began to suspect and later determined that Arizona's plans were to not renew the TOPSA at all.

### Defendants Plan to Terminate the TOPSA, Acquire the Arboris Plant, and Eliminate Arboris as a Competitor in the Non-GMO Phytosterols Market

46.     While Arizona's stated reason for refusing to renegotiate the TOPSA was that it was "too early," Arboris has now learned that Arizona's refusal has no legitimate purpose and is in fact a bad faith attempt to destroy Arboris.

47.     Despite the fact that the Arboris joint venture is intended to proceed for 30 years, Defendants are now together taking the unjustifiable position that in 2014 Arizona can arbitrarily refuse to renegotiate the TOPSA altogether and thereby artificially hasten the end

of the Ground Lease after only 10 years and simultaneously trigger a right under the Ground Lease for Arizona-Arboris to acquire all of Arboris' physical assets (for negligible cost).

48.    Defendants' position is that while the term of the Ground Lease is 30 years, it includes a provision calling for early termination upon certain conditions, one of which is the expiration or termination of the TOPSA. Defendants are asserting that this linking of the term of the Ground Lease to that of the TOPSA allows Arizona the ability to force the Ground Lease's early termination by arbitrarily refusing to renegotiate and renew the TOPSA. In that event, Defendants contend, Arizona-Arboris can not only truncate the Ground Lease to 10 years but it can also then acquire all of Arboris' assets (except its intellectual property), under a provision in the Ground Lease allowing the landlord, at its sole discretion, the option to acquire (at the nearly fully depreciated value) all of the improvements made on the premises during the lease, which would essentially be all of Arboris' physical assets, including its plant, equipment, and fixtures. The Ground Lease states:

> Tenant shall . . . at Landlord's option . . . convey all improvements, tangible personal property and equipment and fixtures thereon in the same condition as existed as of the date of installation, acquisition or construction of such improvements, equipment and fixtures . . . for a purchase price equal to its then current book value.

Ground Lease, ¶ 6.4.

49.    While this purchase option makes sense in the context of the long-term 30 year venture, at the end of which the plant would be near the end of its useful life, the Defendants are attempting, through Arizona's arbitrary refusal to currently renew the TOPSA, to achieve an unintended windfall and to simultaneously completely eliminate the

Arboris joint venture just 10 years from its inception and 4 years from now while the plant is still relatively young.

50.     The Defendants' position contravenes the very purpose and intent of the Arboris joint venture and leads to nonsensical, unjust, and unconscionable results.  Despite Defendants having taken no financial risk in Arboris, under the Defendants' plan, Arizona's unilateral refusal to renew the TOPSA without cause would allow Arizona-Arboris, just 10 years after Arboris became operational, to oust Arboris from its fully functioning, $65 million state-of-the-art phytosterols plant.  Thus, with no raw materials and no plant, Defendants would effectively capture and take over Arboris' business, market share, and its $50MM to $60MM a year revenue stream for themselves.

51.     Defendants' position is contrary to and violates the clear mandate, purpose and intent of the Arboris Operating Agreement which provides that Arboris shall operate the phytosterols extraction and processing facility in Savannah, Georgia *for a period of 30 years.* This business cannot be terminated earlier unless there is an earlier event of dissolution or a vote of the members that cuts short the 30 year term - none of which events has occurred.

52.     Indeed, without a plant through which Arboris can process TOP and extract non-GMO phytosterols, the entire purpose of the Arboris Operating Agreement is thwarted, and Arboris' reasonable contractual expectations are unfairly denied.  Moreover, Arizona-Arboris and Arizona would be unjustly enriched.

53.     Again, the shorter term of the TOPSA versus that of the Ground Lease and the ability to renew it on mutually agreeable shorter terms was intended merely so that the price being paid for the TOP supply could, in a reasonable number of years, and from time to time,

be renegotiated and re-set to reflect current market conditions. The shorter term of the TOPSA was never intended to be used as a trap with which to undo the Operating Agreement and Ground Lease and to destroy Arboris by 2014.

### Arboris First Seeks Practical, Non-Judicial Solutions to Ensure its Survival; Arizona-Arboris "Vetos" These Attempts

54.     As unreasonable as the Defendants' position and conduct have been, Arboris first considered and sought non-judicial means to resolve the situation. It made efforts towards building an alternate plant facility, buying competitors in other locations, and diversifying its product offerings.

55.     However, in blatant violation of its fiduciary obligations to Arboris, Arizona-Arboris has "vetoed" all attempts by Arboris to save itself and has vowed to continue to do so.

56.     On September 11, 2009, Arboris and Arizona held a meeting to discuss Arboris' plans to build an alternate plant site that could be operational at the end of the TOPSA. Mr. Verhaar and Gary Reed of Arizona were present. Mr. Verhaar stated at this meeting that Arizona-Arboris would simply exercise its "veto" if Arboris undertook any efforts to try to build an alternate plant site, on the grounds that building an expensive new plant would be corporate "waste." Mr. Verhaar gave only hollow assurances that Arboris should have confidence that the TOPSA issues would be resolved while simultaneously refusing to renegotiate renewal of the TOPSA.

57.     Arizona-Arboris derives this extraordinary "veto" power from two provisions in the Operating Agreement. The first provides that the "Purpose and Business of the Company" is the "ownership and operation of a phytosterols extraction and purification plant

located in Savannah, Georgia and the sale and supply of phytosterols and Arboris Non Sterol Materials . . . as defined in the [TOPSA]." This provision expressly provides that "without the *unanimous consent* of the Members" Arboris cannot engage in any other business. Thus, any efforts by Arboris to erect or purchase an alternate plant must be approved by Arizona-Arboris, which has demonstrated that it has only Arizona's best interests in mind. Likewise, the Operating Agreement also provides that Arboris is prohibited from expending capital or incurring debt in certain minimal amounts without the *unanimous approval* of the Members. This provision also effectively allows Arizona-Arboris to block any significant effort by Arboris to purchase or build an alternate facility, which would necessarily require significant expenditure above minimum amounts.

58.     This "veto" power and right of control over Arboris is far out of proportion to Arizona-Arboris' minority ownership interest and is being used against Arboris unfairly and anticompetitively. Further, the manner in which Arizona-Arboris, an *owner* of Arboris, is exercising this veto is an unjustifiable violation of its fiduciary duty of loyalty to Arboris.

### Arizona-Arboris Vetoes Arboris' Attempt to Purchase Alternate Facility

59.     Not only has Arizona-Arboris vowed to veto any future attempt by Arboris to build an alternate plant, Arizona-Arboris has used its veto to thwart at least one previous bid by Arboris to purchase a competing business.

60.     In December 2008, Arizona-Arboris impeded the acquisition of Phytosource, Arboris' major non-GMO phytosterol competitor, by use of its veto power and under cover of a proposal involving a predatory transfer of company value. The purchase of Phytosource was clearly in Arboris' best interests, as it would have allowed Arboris an alternate facility to

16

continue its operations beyond the Savannah River Plant.   However, Arizona-Arboris vetoed the deal in order to effectuate Arizona's goal of eliminating Arboris as a competitor.   This veto was particularly damaging to Arboris because, as it turned out, one of Arboris' largest customers ultimately bought Phytosource, and so the failure by Arboris to consummate the Phytosource purchase ended up as double loss for Arboris.

### Arizona-Arboris Vetoes Arboris' Attempt to Develop Alternative Products

61.     For similar reasons, Arizona-Arboris vetoed Arboris' attempts to diversify its product offerings into "dispersible sterols technology."   This technology would have created an avenue for Arboris to grow into an expanded market position and to stay in business beyond 2014, even if Arizona-Arboris took over the Savannah plant.

62.     Arboris was offered a deal whereby a third-party would license the dispersible technology to Arboris subject to the TOPSA being in force.   Again, this would have financially benefitted Arboris, yet Arizona-Arboris purposely used its veto power to impede the license resulting in a termination of this opportunity.

63.     Thus, while simultaneously threatening to exercise an asserted right in 2014 to cut off Arboris' TOP supply and acquire all of its assets, the Defendants, through Arizona-Arboris, are also abusing the "veto" power to prevent Arboris from expanding its operations and saving itself from the destruction of its business.   If unstopped, Defendants would have unfairly accomplished the unnecessary elimination of Arboris through the acquisition of its thriving multi-million dollar business for nearly no cost and would succeed to a dominant sixty percent world-wide market share in the Non-GMO Phytosterols Market.

## Defendants Obtain the Final Component,
## the Intellectual Property, By Simply Taking It

64.    While obtaining the Arboris Plant is a key component of the Defendants' plan, acquisition of Arboris' technology and intellectual property is equally important. As the agreements discussed below prohibit the Defendants from using the "Arboris Technology" other than for the purpose of Arboris' operations, the Defendants have undertaken to simply misappropriate it.

65.    This is in direct violation of the Defendants' promises, representations, and duties to Arboris. Under the Contract Operations Agreement, Arizona-Arboris was granted *limited* rights to use the Arboris Technology for the purposes of furthering Arboris' business and that agreement. Paragraph 4.1 of the Contract Operations Agreement provides:

> Arboris hereby grants to AAI a non-exclusive, non-transferable, worldwide, paid-up, royalty-free, irrevocable license during the Term to use, reproduce and modify the <u>Arboris Technology</u> provided to AAI by Arboris <u>exclusively in connection with the</u> **<u>Services</u> and the <u>Project</u>**.

> <u>Contr. Ops. Agr.</u>, ¶ 4.1.

66.    Under the Contract Services Agreement, Arizona-Arboris contracted with Arizona to perform some of the work required under the Contract Operations Agreement. The Contract Services Agreement similarly contains a Paragraph 4.1 by which Arizona-Arboris granted Arizona a similar license to "use, reproduce and modify the Arboris Technology provided to Arizona-Arboris by Arboris <u>exclusively in connection with the</u> **<u>Services</u> and the <u>Project</u>**."

67.    The "Services" defined under the Contract Operations Agreement are the "Contract Services, Additional Services and any other mutually agreed services provided by

AAI to Arboris *under this Agreement*." Contr. Ops. Agr. ¶ 1.2(18). The "Project" is the "operation and management of a plant within Arizona's Savannah, Georgia site to extract and purify sterols generated from the processing of [TOP]." Contr. Ops. Agr. ¶ 1.2(14). These terms are similarly defined in the Contract Services Agreement between Arizona Arboris and Arizona.

68. The "Arboris Technology" licensed under both the Contract Operations Agreement and Contract Services Agreement includes:

> (i) evaluation, technical, scientific, regulatory, engineering, architectural, marketing, financial and business information, data, reports, designs, plans, studies, drawings, diagrams, flow charts, and any and all intellectual property rights thereto; and (ii) works of authorship, software, databases, hardware, equipment, formulae, compositions of matter, processes, products, articles of manufacture, and any and all intellectual property rights thereto.
>
> Contr. Ops. Agr., ¶¶ 1.2(3) and (17)

69. The Contract Operations Agreement and the Contract Services Agreement require Arizona-Arboris and Arizona to each maintain in confidence all "Confidential Information," which includes the Arboris Technology. These agreements also prohibit disclosure of the "Confidential Information" to unauthorized persons or its use except in connection with the Services and the Project. Both agreements provide that Arizona and Arizona-Arboris are to:

> exercise reasonable efforts to ensure that Authorized Persons . . . maintain the Confidential Information in strict confidence and refrain from using and duplicating the Confidential Information, except during the Term and <u>exclusively for purposes of supporting the Receiving Party and/or the Disclosing Party in connection with the Services and Project.</u>

<u>Contr. Ops. Agr.</u>, ¶ 4.5.
<u>Contr. Svc. Agr.</u>, ¶ 4.5.

70.   The Defendants' obligations to use the Arboris Technology only in connection with these agreements and to preserve its Confidential Information were material inducements for Arboris to enter the Arboris Agreements and to disclose the Arboris Technology to the Defendants.

71.   Arboris has recently learned that, despite their promises, Defendants, at the direction of Marterer, assigned teams to undertake concerted efforts to study and find ways of circumventing, modifying, and working around the Arboris Technology so that Arizona and Arizona-Arboris could misappropriate the Arboris Technology for their own use after Arboris had been evicted from the Savannah plant.  These efforts were led, in part, by a person named David Garrett at Marterer's direction.   Marterer also threatened to make Arboris' operation untenable by threatening to cut off its waste water services.

72.   The Defendants' misappropriation of Arboris' Confidential Information and the Arboris Technology unfairly undermines and frustrates the bargain reached by the parties, violates established trade secret law, violates duties of good faith and fair dealing, breaches duties of loyalty owed to Arboris, and breaches contractual duties owed to Arboris.

73.   Arboris now brings this suit against the Defendants for injunctive and declaratory relief and damages.

74.   All conditions precedent to this action have been met, have been waived, or have occurred.

75.   Arboris has retained the undersigned law firm to enforce its rights in this suit and has agreed to pay a reasonable fee for its services. Pursuant to the Operating Agreement,

20

the Ground Lease, the TOPSA, 15 U.S.C. § 15, and Sections 688.005 and 501.2105, Florida

Statutes, Arboris is entitled to recover its reasonable attorneys' fees, costs, and expenses.

## COUNT ONE
### Violation of the Clayton Act, Section 7, 15 U.S.C.A. § 18

76.     Plaintiff incorporates its allegations in paragraphs 1 through 75 above and

states further as follows.

77.     Through the Ground Lease purchase option, Arizona threatens to acquire the

physical improvements Arboris made on the leased premises, which effectively includes

substantially all of Arboris' physical assets, including the entire Arboris Plant.

78.     Arizona's anticipated acquisition of Arboris' assets will eliminate Arboris as a

competitor in the relevant market, the effect of which will be the substantial impairment or

lessening of competition.

79.     The relevant market for the purposes of determining the anticompetitive and

monopolistic consequences of the Defendants' acquisition of Arboris is the market for the

manufacture, distribution, and sale of non-GMO phytosterols in the United States and Europe

(the "Non-GMO Phytosterols Market"), which is part of the trade or commerce among the

several states and the trade or commerce with foreign nations.

80.     The Non-GMO Phytosterols Market is already oligopolistic and highly

concentrated, having only two currently significant world-wide competitors, Cognis and

Arboris.     Arboris has 60% of the Non-GMO Phytosterols Market and Cognis has

approximately 30%.  Of the Non-GMO phytosterols produced from TOP, Arboris has 80%

of the market.   Other than Arboris, only Cognis has the technology and facilities to

commercialize non-GMO phytosterols from TOP. Cognis does not have a captive TOP supply and must therefore purchase TOP at arm's length from MWV and GP.

81. The market for the supply of the TOP raw material for the production of phytosterols is also oligopolistic and highly concentrated, having only three U.S. based and one Finland based world-wide competitors.

82. Arizona is a well-equipped and well-financed corporation engaged in the same or related lines of commerce as Arboris and is preparing to enter an oligopolistic market. As such, Arizona is either (i) an actual substantial direct competitor of Arboris (although currently prohibited by agreement from competing due to its involvement in the Arboris joint venture), (ii) an actual potential *de novo* competitor of Arboris, or (iii) a perceived potential *de novo* competitor of Arboris in the non-GMO phytosterols market.

83. There is a reasonable probability that Arizona, but for the acquisition of Arboris, would have entered the Non-GMO Phytosterols Market in the near future independently either through *de novo* entry or a toehold merger. The facts supporting this include but are not limited to the following:

  a. Prior to Härting 's invention of the Härting  Sterol Process and the formation of Arboris, Arizona made its own attempts to render phytosterols from TOP in a commercially viable manner.  But for Arizona's failures to achieve a commercially viable method of rendering phytosterols from TOP, it would have entered the market on its own.

b.  Arizona has demonstrated its intent to enter the market independently by undertaking to misappropriate the Arboris Technology and by the positions it is taking under the TOPSA and Ground Lease.

c.  Arizona's former President, Gerald Marterer, has stated to former Arizona insiders on a number of occasions that it was Arizona's desire to starve Arboris of its supply, take over its business, and manufacture phytosterols itself without Arboris;

d.  By virtue of its involvement in and ownership of a percentage of Arboris, Arizona is already to some extent directly engaged in the non-GMO phytosterols business and receives a steady stream of revenues from the sale of non-GMO phytosterols;

e.  Defendants have acknowledged their status as potential future competitors in the non-GMO phytosterols by signing a non-competition provision in the Arboris Operating Agreement;

f.  Arizona has the incentive to enter the market because of its unique position as the largest single producer of TOP and would have no raw material costs, thereby dramatically increasing its profit from the sale of phytosterols.

g.  There are no financial impediments to Arizona entering the market, as Arizona is a large, well financed world-wide chemical manufacturing enterprise. Arizona's supply of TOP is occasioned by its development of a host of other pine derived chemicals, which Arizona produces and distributes

throughout the world. Arizona is thus well positioned to add another chemical substance to its existing worldwide distribution network.

h. Arizona has firsthand knowledge, through its involvement with Arboris, of how to successfully manage and operate a world-wide non-GMO phytosterols manufacturing, marketing, and distribution business.

i. Arizona currently supplies Arboris with the pool of skilled labor that operates the Arboris Plant and has gained knowledge on how to successfully operate a non-GMO phytosterols extraction facility.

j. Arizona has expressed its intent to enter the non-GMO phytosteols business in its statements to third parties.

84. With Arboris eliminated through acquisition, Defendants would naturally capture either all or the vast majority of Arboris' market share because:

a. The elimination of Arboris, with its 60% non-GMO market share (80% of TOP based), would leave a massive unfilled gap in the world-wide market to supply customers with non-GMO phytosterols, a void that Cognis and others would be unable to fill absent major new capital expansion;

b. Defendants would be quickly able to seamlessly take over where Arboris left off, having acquired Arboris' state-of-the-art facility, employing the same knowledgeable and skilled workforce currently running the Arboris Plant and having full knowledge of the customer base;

c. With years of accrued knowledge regarding Arboris' customers, distribution networks, and marketing and sales practices, Defendants would naturally be able

to capture most if not all of Arboris' market share, and Arboris' customers, which already perceive Arboris as a "joint venture" including Arizona, would likely perceive no real difference in buying phytosterols from Arboris versus Defendants.   Arboris' customers would therefore likely be easily captured by Defendants; and

d.   The only other significant competitor in the relevant market, Cognis, would not have the capability to quickly expand production and serve Arboris' former customers' needs before Arizona could capture their business.

85.     Defendants' entry into the market through means other than acquisition of Arboris would likely result in a deconcentrated market or a procompetitive effect.   In that event, there would be increased competition in the market as there would be an additional significant competitor.

86.     Conversely, with only two significant players currently competing in the relevant market, Defendants' entry into the market through the acquisition of Arboris rather than through independent means will substantially impair competition in the market.

87.     With the complete elimination of the dominant competitor, Arboris, and with a captive supply of raw materials, Defendants would be advantaged compared to Cognis, which would have significant arms-length, merchant raw material costs.   Conversely, with no cost for raw material, an installed capacity that almost doubles the current production volumes, very low cost related to the assets acquisition, no personnel training required, and no startup costs, Defendants' entry into the market by acquisition of Arboris will force other

competitors to enter or continue in the market on a vertically integrated basis in order to compete.

88.     Thus, this "vertical" acquisition of Arboris will not only eliminate the largest competitor in the relevant market, it will only further increase barriers to entry into it. Even without this threatened acquisition, the barriers to entry into the Non-GMO Phytosterols Market are extremely high. The limited number of TOP producers and the relatively limited worldwide supply of TOP restrict the number of potential entrants into the Non-GMO Phytosterols Market. Further, the required investment to construct an economic scale phytosterols extraction facility, not including the cost to develop the necessary intellectual property, is very high -- between $60 and $75 million.

89.     Defendants' acquisition of Arboris violates or threatens to violate the Clayton Act, 15 U.S.C. § 18. Arboris has no adequate remedy at law. If Defendants are not preliminarily and permanently enjoined and restrained from their anti-competitive activity, Arboris, which has the largest market share in the relevant market, will likely be completely eliminated as an independent and effective competitor in the relevant market both currently and in the future. Thus, competition will be substantially lessened in the relevant market.

90.     Arboris is therefore entitled to relief under the antitrust laws.

WHEREFORE, Arboris respectfully requests that judgment be entered declaring that Defendants have violated the Clayton Act, 15 U.S.C. § 18, and

(a) preliminarily and permanently enjoining Arizona and Arizona-Arboris, and each of them, their officers, directors, employees and agents, and all persons acting on their behalf or in concert with them from (i) acquiring or attempting to acquire

any of Arboris' assets; (ii) exercising the purchase option under the Ground Lease; (iii) acquiring or exercising any ownership, control, or voting rights over Arboris; (iv) participating in any management decisions of Arboris or exercising, directly or indirectly, any influence or control on the management of Arboris; (v) transferring any rights of acquisition, ownership or control to any person without court approval; and (vi) refusing to provide Arboris access to and use of the Arboris Plant on reasonable terms and conditions;

(b) divesting Arizona-Arboris of its ownership interest or rights to acquire ownership interests in Arboris;

(c) divesting Arizona-Arboris of the purchase option under the Ground Lease;

(d) de-linking the term of the Ground Lease from the TOPSA;

(e) pursuant to 15 U.S.C. § 15, granting Arboris threefold the damages sustained as a result of the antitrust violations alleged plus punitive damages, together with interest, costs and attorneys' fees in bringing this action and all other relief as this court deems just and appropriate.

## COUNT TWO
### Violation of Sherman Act, Section Two, 15 U.S.C.A. § 2

91.     Arboris incorporates its allegations in paragraphs 1 through 75 and 77 through 88 above and states further as follows.

92.     Defendants, Arizona and Arizona-Arboris, have engaged in and are continuing to engage in anticompetitive conduct with the specific intent to monopolize the

Non-GMO Phytosterols Market and have either achieved such monopoly power already or have a dangerous probability of achieving such monopoly power.

93.     Defendants have acquired or intend to acquire this monopoly power through anticompetitive means by destroying Arboris' ability to survive as a competitor in the Non-GMO Phytosterols Market.  The Defendants are taking steps to accomplish this by refusing to renegotiate the TOPSA, vetoing all attempts by Arboris to build an alternate plant site or to expand or diversify its business beyond the existing Arboris Plant, and ultimately exercising what amounts to an illegal option to acquire all of Arboris' plant and equipment in 2014.

94.     By using the threat of the acquisition of the Arboris Plant and then blocking Arboris' current attempts to ensure its survival in the event of such acquisition, Defendants have clearly demonstrated their intent to monopolize and have already to a certain extent obtained a measure of monopoly power over the Non-GMO Phytosterols Market.

95.     Alternatively, Defendants are dangerously close to achieving monopoly power over the non-GMO phytosterols market.  If Defendants' conduct is not enjoined, they will eliminate the dominant company in the relevant market and will easily succeed to Arboris' 60% market share position.

96.     Defendants' acquisition of monopoly power through the elimination of Arboris as a competitor will have a substantial adverse impact on competition within the relevant market.  Instead of adding a competitor to the market, the elimination of the dominant competitor will clearly result in greater market concentration in an already oligopolistic market.

97.     In addition to capturing a dominant market share, Defendants will be able to vertically integrate the tall oil processing business by adding the phytosterol products. This will expand Arizona's dominance because it will be the first time a TOP producer/supplier has entered the Non-GMO Phytosterols Market. Arizona's vertical integration of the supply and manufacturing businesses will substantially impair competition in the market by creating even greater barriers to entry and allowing Arizona to control prices and exclude competition from the relevant market.

98.     Defendants will be able to maintain such monopoly power due to the high barriers to entry, including but not limited to the limited worldwide supply of the raw material (of which Arizona controls nearly half), the high start-up costs for others to erect manufacturing facilities, and the need for specialized intellectual property/technology to even make possible a functioning phytosterols operation.

99.     All of Defendants' intentional actions together and individually unnecessarily exclude Arboris from competing by eliminating it as a competitor in the relevant market and will thereby substantially impair competition.  Defendants' conduct has no legitimate business justification and constitutes a concerted and willful attempt to monopolize and the monopolization of the tall oil processing industry and the non-GMO phytosterols market, which is in violation of section 2 of the Sherman Act, 15 U.S.C. § 2.

100.    Arboris has suffered and will continue to suffer damages as a result of the Defendants' anticompetitive conduct.

101.    In addition, Arboris has no adequate remedy at law.  If Defendants are not enjoined and restrained from their anticompetitive activity, Arboris will be completely

eliminated as a competitor in the relevant market, thereby substantially lessening competition in that market.

102.    Arboris is therefore entitled to relief under the antitrust laws.

WHEREFORE, Arboris respectfully requests that judgment be entered declaring that Defendants have violated the Sherman Act, 15 U.S.C. § 2, and

(a) preliminarily and permanently enjoining Arizona and Arizona-Arboris, and each of them, their officers, directors, employees and agents, and all persons acting on their behalf or in concert with them from (i) acquiring or attempting to acquire any of Arboris' assets; (ii) exercising the purchase option under the Ground Lease; (iii) acquiring or exercising any ownership, control, or voting rights over Arboris; (iv) participating in any management decisions of Arboris or exercising, directly or indirectly, any influence or control on the management of Arboris; (v) transferring any rights of acquisition, ownership or control to any person without court approval; and (vi) refusing to provide Arboris access to and use of the Arboris Plant on reasonable terms and conditions;

(b) divesting Arizona-Arboris of its ownership interest or rights to acquire ownership interests in Arboris;

(c) divesting Arizona-Arboris of the purchase option under the Ground Lease

(d) de-linking the term of the Ground Lease from the TOPSA; and

(e) pursuant to 15 U.S.C. § 15, granting Arboris threefold the damages sustained as a result of the antitrust violations alleged, plus punitive damages, together with

interest, costs and attorneys' fees in bringing this action and all other relief as this court deems just and appropriate.

## COUNT THREE
### Violation of Sherman Act, Section Two - Refusal to Deal

103.   Arboris incorporates its allegations in paragraphs 1 through 75, 77 through 88 and 92 through 102 above and states further as follows.

104.   Defendants' conduct constitutes an illegal refusal to deal with Arboris in violation of 15 U.S.C. § 2.

105.   The Arboris Plant is a facility essential to effective competition in the relevant market. The Arboris Plant is highly specialized and is one of only two plants in entire world that can produce TOP derived non-GMO phytosterols. Sixty percent of all of the world's non-GMO phytosterols (80% of TOP-based) are produced by Arboris from the Arboris Plant.

106.   Defendants have taken and intend to continue taking action to deprive Arboris of this essential facility in an effort to monopolize the Non-GMO Phytosterols Market. Defendants are unjustly threatening to exercise a lease termination provision and a purchase option to preclude Arboris from this essential facility and to refuse to deal with Arboris. Specifically, Defendants have together refused to (i) engage in discussions to renew the TOPSA, (ii) de-link the Ground Lease from the TOPSA, and (iii) relinquish the Ground Lease purchase option. This refusal to deal will deprive Arboris of the Arboris Plant and will thereby substantially diminish competition in the relevant market.

107.   Arizona-Arboris is also monopolizing or attempting to monopolize by threatening to block, via its "veto" power, any current effort by Arboris to purchase or build

an alternate plant facility prior to 2014. While Arboris should not be required to build an alternate plant in order to survive beyond 2014, a new non-GMO phytosterols extraction facility like the Arboris Plant would have to be built and could likely not be bought, as only one other presently exists in the world.

108.   All of Defendants' intentional actions together and individually unnecessarily and improperly exclude Arboris from competing by eliminating it as a competitor in the relevant market and will thereby substantially impair competition. Defendants' conduct has no legitimate business justification and constitutes a concerted and willful attempt to monopolize and the monopolization of the non-GMO phytosterols market, which is in violation of section 2 of the Sherman Act, 15 U.S.C. § 2.

109.   Arboris has no adequate remedy at law. If Defendants are not preliminarily and permanently enjoined and restrained from their anticompetitive activity, Arboris will be completely eliminated as a competitor in the relevant market and competition will thereby be substantially lessened in that market.

110.   Arboris is therefore entitled to relief under the antitrust laws.

WHEREFORE, Arboris respectfully requests that judgment be entered declaring that Defendants have violated the Sherman Act, 15 U.S.C. § 2, and

(a) preliminarily and permanently enjoining Arizona and Arizona-Arboris, and each of them, their officers, directors, employees and agents, and all persons acting on their behalf or in concert with them from (i) acquiring or attempting to acquire any of Arboris' assets; (ii) exercising the purchase option under the Ground Lease; (iii) acquiring or exercising any ownership, control, or voting rights over

Arboris; (iv) participating in any management decisions of Arboris or exercising, directly or indirectly, any influence or control on the management of Arboris; (v) transferring any rights of acquisition, ownership or control to any person without court approval; and (vi) refusing to provide Arboris access to and use of the Arboris Plant on reasonable terms and conditions;

(b) divesting Arizona-Arboris of its ownership interest or rights to acquire ownership interests in Arboris;

(c) divesting Arizona-Arboris of the purchase option under the Ground Lease

(d) de-linking the term of the Ground Lease from the TOPSA; and

(e) pursuant to 15 U.S.C. § 15, granting Arboris threefold the damages sustained as a result of the antitrust violations alleged, plus punitive damages, together with interest, costs and attorneys' fees in bringing this action and all other relief as this court deems just and appropriate.

## COUNT FOUR
### Request for Declaratory Judgment

111.    Plaintiff incorporates its allegations in paragraphs 1 through 75 above and states further as follows.

112.    Pursuant to 28 U.S.C. § 2201, Plaintiff brings this action for declaratory judgment. An actual controversy exists among the parties to this suit with regard to the interpretation and effect of certain contractual provisions among them. A judicial determination is necessary and appropriate at this time so that the parties may determine their rights and duties under the Operating Agreement, the TOPSA, and the Ground

Lease. All of these agreements are interlinked and cannot be interpreted in isolation from one another. Plaintiff respectfully asks this Court to declare the respective rights of the parties with regard to these agreements and disputes. In support of this action, Plaintiff states further as follows.

113.    On June 5, 2001, Arboris was formed as a joint venture whose members were Arboris Roots and Arizona-Arboris.

114.    From its inception, the members intended that Arboris' business proceed for a period of at least 30 years.

115.    On July 30, 2002, several agreements were executed in relation to the joint venture, including but not limited to the Contribution Agreement, the Operating Agreement, the Ground Lease, and the TOPSA.

The Contribution Agreement

116.    The Contribution Agreement was executed by Arboris and its members Arizona-Arboris and Arboris Roots. It provided for the contributions that would be made to the joint venture and the agreements that Arboris would enter into as a part of the joint venture, including but not limited to the Operating Agreement, the Ground Lease, and the TOPSA.

The Operating Agreement

117.    The Operating Agreement provided that Arboris' business purpose was the "ownership and operation of a phytosterols extraction and purification plant located in Savannah, Georgia and the sale and supply of phytosterols and Arboris Non Sterol Materials

34

(as defined in the Supply and Processing Agreement dated the date hereof between Arizona Chemical Company . . . and the Company)."

118.    The Operating Agreement mandates that this business purpose was to be carried out for a period of 30 years.

119.    The only way for the Arboris joint venture to terminate earlier than 30 years was upon an earlier vote of the members to dissolve Arboris or an earlier judicial dissolution. Neither of those events has occurred.

### The Ground Lease

120.    At the time the Operating Agreement was executed, Arboris had no existing plant with which to process phytosterols.  The Arboris plant was to be built on vacant land owned by Arizona.  In that regard, at the same time the Operating Agreement was executed, Arboris also entered into the Ground Lease with Arizona-Arboris (Arboris' 10% owner).

121.    Consistent with the Operating Agreement, the Ground Lease also had a term of 30 years.  Under these agreements, Arboris had a contractual right and expectation that its business would proceed for a period of 30 years.

### The TOPSA

122.    The Operating Agreement both referenced and attached the TOPSA, an agreement between Arboris and Arizona under which Arizona would exclusively supply the joint venture with all of its TOP needs.

123.    Although the Operating Agreement expressly requires that the joint venture will proceed for 30 years, the TOPSA has an "initial" term of just 10 years.  However, the TOPSA calls for its renewal upon mutually agreeable terms at least 2 years prior to the end

of the initial term. The reason that the initial term of the TOPSA was shorter than that of the Ground Lease and the Operating Agreement was to permit the parties to renegotiate and reset the price to be paid for TOP to keep it relative to market prices and conditions.

124.   The shorter term of the TOPSA was never intended as a mechanism for Arizona to arbitrarily alter the term of Ground Lease or to otherwise shorten the joint venture from 30 years to just 10.

### Arboris Builds its Plant Based Upon a 30 Year Term

125.   Based upon the agreed 30 year duration of the joint venture and having secured a reliable source of raw material, Arboris' 90% member, Arboris Roots, proceeded to finance the entire $65 million startup cost to build Arboris' plant on the vacant land owned by Arizona. Arizona and Arizona-Arboris financed no portion of these startup costs and have made neglible financial contributions to Arboris.

### Defendants Assert An Unjustified Contractual Position

126.   Now that Arboris has become dependent upon Arizona both for its raw material supply and for access to its own plant facility, in bad faith the Defendants are now asserting an interpretation of the TOPSA and the Ground Lease that is nonsensical, unjust, and contrary to their intent and purpose. And, they are doing so for the improper purpose of eliminating Arboris altogether and capturing its entire business for themselves.

127.   Under their interpretation, the Defendants contend, in effect, that they have the right to destroy Arboris just 10 years after becoming operational of the ability to continue as a joint venture for the remaining 20 years of the intended 30 year term of the Operating

Agreement and that they can essentially eliminate Arboris and take over the business without it in 2014.

128.    For this proposition, Arizona unreasonably relies on a provision in the Ground Lease that states that its 30 year term can terminate early upon expiration or termination of the TOPSA.  Due to the tying of these term provisions, Arizona thereby claims that Arizona-Arboris has the right to truncate the Ground Lease from 30 years to 10 and to oust Arboris from its $65 million facility in 2014.  Moreover, Defendants contend that because the Ground Lease contains a provision allowing the landlord, Arizona-Arboris, a discretionary option upon termination to purchase all of the improvements made upon Arizona's land for their depreciated value, in 2014, Arizona-Arboris can, in addition to denying Arboris access to its plant, acquire the entire plant for negligible cost.

129.    The Defendants' interpretation of these agreements is unreasonable, is contrary to their intent and purpose, and violates the intent and purpose of the 30-year joint venture.   The Operating Agreement mandates that the Arboris joint venture is to proceed in the business of operating the phytosterols extraction and processing facility in Savannah, Georgia *for a period of 30 years*, not 10 years.

130.    The Defendants' interpretation would result in the unfair destruction of Arboris just 10 years from becoming operational, in clear violation of the Operating Agreement, and it would deny Arboris its legitimate contractual expectations of proceeding in its business for 30 years.

131.    The Defendants' interpretation is nonsensical and would lead to unintended and unconscionable results.  It would unjustly enrich the Defendants, who claim to have the

right in just 2014 to obtain for negligible cost a fully functioning phytosterols plant that cost $65 million to build for which they paid absolutely nothing. Moreover, if unchecked, the Defendants would unjustly eliminate all competition from Arboris in the Non-GMO Phytosterols Market, succeed in taking over a multi-million dollar a year business and revenue stream from Arboris, and obtain its dominant 60% market share in the Non-GMO Phytosterols market for essentially no cost.

132.   This result is not the intent of the Arboris joint venture or the agreements executed in relation to it.

WHEREFORE, Arboris respectfully requests a declaration from the Court that de-links the Ground Lease from the TOPSA so that if Arizona refuses to renew the TOPSA or the TOPSA otherwise expires prior to the end of the term of the Operating Agreement, Arizona-Arboris does not have the right to terminate the Ground Lease or to exercise the purchase option in the Ground Lease.

Alternatively, Arboris respectfully requests a declaration from the Court that the TOPSA term provision and the Ground Lease early termination provision as it relates to the TOPSA are void as a matter of law because they are inconsistent with the Operating Agreement and inconsistent with the intent and purpose of the Arboris joint venture.

## COUNT FIVE
### Breach of the TOPSA and the Ground Lease

133.   Plaintiff incorporates its allegations in paragraphs 1 through 75 and 112 through 132 above and states further as follows.

134.   The Arboris Operating Agreement, to which Arizona-Arboris is a party, mandates that the Arboris joint venture proceed for a period of 30 years.

135.   The Operating Agreement references and attaches the TOPSA and the Ground Lease, and all three agreements were executed at the same time.   Marterer executed the TOPSA on behalf of Arizona, and he simultaneously executed the Operating Agreement and the Ground Lease on behalf of Arizona-Arboris.   All three agreements are interlinked and must be read in conjunction with one another to determine their overall intent, purpose, and meaning.

136.   The express stated intent in the Arboris Operating Agreement is that the Arboris joint venture shall continue for a period of 30 years.

137.   The term of the Ground Lease corresponds with this intent, also having a term of 30 years.

138.   While the TOPSA's initial term was shorter than that of the Ground Lease (10 years versus 30 years), it calls for its renewal at least 2 years prior to the end of the initial term on mutually agreeable terms.   The purpose of the shorter term of the TOPSA was simply to allow the parties to renegotiate the price paid for TOP in accordance with market conditions.

139.   The early termination provision in the Ground Lease was not intended to affect or alter the 30 year duration of the joint venture or allow a termination of the Ground Lease without cause.   It was not the intent of the parties under the Ground Lease that Arizona-Arboris could terminate it and acquire the Arboris Plant in the event that Arizona arbitrarily refused to renegotiate and renew the TOPSA.

140.   Arizona has a contractual duty under the TOPSA to engage in good faith negotiations to renew the TOPSA and cannot unreasonably or unjustifiably refuse to renegotiate and renew it on commercially reasonable terms.

141.   Arizona and Arizona-Arboris are now taking the unjustified position that Arizona can arbitrarily refuse to renew the TOPSA and thereby trigger the right by Arizona-Arboris under the Ground Lease to shorten it to 10 years and in 2014 to acquire all of the improvements built upon Arizona's land.  In other words, Defendants now take the incredible position that they can acquire the entire Arboris Plant and effectively all of its physical assets through no breach by Arboris, but simply by Arizona refusing to renew the TOPSA.  The Defendants' unreasonable interpretation would achieve unconscionable results.  They would effectively acquire a $50 to 65 million a year business and its $65 million facility and simultaneously eliminate all competition from the dominant competitor in the market for next to no cost.

142.   By taking this unjustified position, Defendants are repudiating and in breach of the intent and purpose of the TOPSA and the Ground Lease and their obligations thereunder and are also in breach of the covenant of good faith and fair dealing.  The Defendants are unfairly frustrating the contracts' purposes, disappointing Arboris' contractual expectations, and depriving Arboris of the contracts' benefits.

143.   The Defendants' breaches are currently causing damage to Arboris and will continue to cause significant damages to Arboris in the future.

144.   Arboris has demanded, among other things (i) that Arizona immediately engage in negotiations to renew the TOPSA and (ii) that both Defendants confirm in writing

to de-link the Ground Lease term from the TOPSA term.   Arboris has notified the Defendants' repeatedly that their actions are placing Arboris' survival at this time in jeopardy and are currently preventing Arboris from making long term commitments to its customers.

145.   Damages alone may not be sufficient to remedy the Defendants' course of conduct and Arboris may suffer irreparable harm.   Thus, in addition to damages, Arboris seeks injunctive relief to enjoin Defendants from their course of action.

WHEREFORE, Arboris, LLC demands judgment against Defendants, jointly and severally, for temporary and permanent injunctive relief, declaratory relief, and damages plus interest, costs, attorneys' fees, and such other relief as the Court deems just and appropriate.

## COUNT SIX
### Breach of Fiduciary Duty

146.   Plaintiff incorporates its allegations in paragraphs 1 through 75 above and states further as follows.

147.   Arizona-Arboris is a member and minority owner of Arboris and owes Arboris a fiduciary duty of utmost loyalty.

148.   Arizona-Arboris, acting at the direction of and in concert with its parent Arizona, is breaching its fiduciary duties to Arboris to benefit itself and Arizona to the detriment of Arboris.

149.   Arizona-Arboris intends and threatens to terminate the Ground Lease in 2014 and to exercise the purchase option at that time.   Arizona-Arboris knows and intends that doing so will effectively destroy Arboris and allow its parent company instead to succeed to Arboris' position in the non-GMO phytosterols market, for negligible cost.

41

150. Knowing that Arizona-Arboris threatens to exercise the purchase option in 2014, Arboris undertook to diversify its plant holdings and product offerings so that it would not be entirely dependent upon the Savannah River facility.

151. In violation of its fiduciary duties to Arboris and for the purpose of effectuating Arizona's plan to cut off Arboris' supply and acquire its plant, Arizona-Arboris has unjustifiably used its veto right to the detriment of Arboris. Arizona-Arboris has unreasonably vowed to veto any attempt to build an alternate plant, has vetoed a potentially lucrative deal for Arboris to purchase a competitor and obtain an alternate facility, and has unreasonably vetoed efforts to diversify its product offerings beyond phytosterols. In doing so, Arizona-Arboris has wrongfully placed its interests and the interests of its parent, Arizona, ahead of the interests of Arboris, to which it owed and continues to owe fiduciary duties.

152. Arboris has suffered and will continue to suffer significant damages from Arizona-Arboris' breaches, including but not limited to multiple millions of dollars in future lost revenues and profits.

153. The legal remedy of damages may not be sufficient in these circumstances to remedy Arizona-Arboris' improper conduct. If Arizona-Arboris is not enjoined from its improper conduct, Arboris will suffer irreparable harm.

WHEREFORE, Arboris, LLC demands judgment against Arizona-Arboris for permanent injunctive relief and damages plus interest, costs, attorneys' fees, a declaration that Arizona-Arboris has breached its fiduciary duties to Arboris, and such other relief as the Court deems just and appropriate.

## COUNT SEVEN
## Misappropriation of Trade Secrets - Chapter 688, Florida Statutes

154.   Plaintiff incorporates its allegations in paragraphs 1 through 75 above and states further as follows.

155.   During the term of the Contract Operations and Contract Services Agreements, Defendants had access to Arboris' trade secrets as defined by Section 688.002(4), Florida Statutes, including information concerning the Arboris Technology.  The Arboris Technology consists of complex technical information, including but not limited to certain proprietary chemical formulas, compilations, methods, techniques, know-how, and patents, that derives economic benefit because the information is not generally known to other persons, is not readily ascertainable by proper means, and is the subject of efforts to maintain its secrecy which are reasonable under the circumstances.

156.   Arboris, at all relevant times, undertook reasonable steps to safeguard its trade secrets and other confidential and proprietary information.   Arboris entered into an agreement prohibiting competition by defendants and also required defendants to contractually agree to keep all information confidential.  Arboris did not reveal information beyond that necessary for the success of the joint venture.  Arboris took reasonable efforts to maintain the secrecy and confidentiality of this proprietary information by, among other things, including confidentiality and non-competition provisions in its required contracts.

157.   Defendants knew that their knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.  At all relevant times, Defendants knew that the Arboris Technology was confidential, that they had a duty to

keep it confidential, that they had a duty not to use it for their own purposes, and that they had a duty to use it solely in the furtherance of the business of Arboris.

158.     Defendants have violated and are continuing to violate the Florida Uniform Trade Secret Act by maliciously misappropriating Arboris' trade secrets as defined in Florida Statute § 688.002(2), without consent and in preparation for using Arboris' trade secrets in a competing business.  Arboris did not permit Defendants access to the Arboris Technology for the purpose of allowing Defendants to usurp it, misappropriate it, infringe upon it, reverse engineer it, work around it, or do anything but use it for the purposes of fulfilling the agreements between the parties and to further the business for the benefit of Arboris.

159.     Defendants have each individually and together in conspiracy misappropriated the Arboris Technology for their own benefit and are threatening to continue to misappropriate the Arboris Technology in the future.

160.     Arboris is entitled to injunctive relief to prohibit the Defendants' continued use and disclosure of Arboris' trade secrets pursuant to Florida's Uniform Trade Secrets Act, Section 688.001, et. seq., which permits injunctive relief to redress any actual or threatened misappropriation of trade secrets.

161.     As a direct and proximate result of the Defendants' unauthorized misappropriation of Arboris' trade secrets, Arboris has suffered and will continue to suffer significant damages from Defendants' misappropriation, including but not limited to multiple millions of dollars in future lost revenues and profits.

162.    The legal remedy of damages may not be sufficient in these circumstances to remedy the Defendants' misappropriation.    If Defendants are not enjoined from misappropriating the Arboris Technology, Arboris will suffer irreparable harm.

WHEREFORE, Arboris, LLC demands judgment against Defendants, jointly and severally, declaring that Defendants have violated Florida's Uniform Trade Secrets Act, and permanent injunctive relief and damages plus interest, costs, attorneys' fees pursuant to Section 688.005, Florida Statutes, and such other relief as the Court deems just and appropriate.

**COUNT EIGHT**
**Violation of the Florida Unfair and**
**Deceptive Trade Practices Act, Section 501.201, et. seq. Florida Statutes**

163.    Plaintiff incorporates its allegations in paragraphs 1 through 75 and states further as follows.

164.    Arizona produces and distributes chemicals derived from pine trees, including TOP, and is engaged in trade or commerce as defined in Section 501.203(8), Florida Statutes. Arboris is a consumer of Arizona's TOP and buys all of its TOP requirements from Arizona. Arboris is not, and has not ever been, engaged in the sale of TOP.

165.    Arizona and Arizona-Arboris together are engaged in unfair, deceptive, and anticompetitive conduct in violation of Florida's Unfair and Deceptive Trade Practices Act, Section 501.201, et. seq. Florida Statutes, in relation to their trade with Arboris, including but not limited to their dealings under the Arboris Operating Agreement, the Contract Operations Agreement, the TOPSA and the Ground Lease.   The Defendants' relationship with Arboris was initiated in Florida.   Their contracts relating to Arboris were negotiated consummated in

Florida. The parties to these contracts all have their primary places of business in Jacksonville, Florida. The parties chose Florida law to govern their business disputes relating to these contracts and also specified the venue for disputes among them is to be the court's location in Jacksonville, Florida.

166. Under the guise of a long term "joint venture" and through deception and false pretenses, Defendants have used Arboris merely as a vehicle to misappropriate Arboris' intellectual property, cut off its supply, prevent it from diversifying its operations to ensure its survival, acquire its plant, capture the fruits of its labor, and monopolize the non-GMO phytosterols market.

167. Defendants' former president, Marterer has expressed to former Arizona insiders that it was the Defendants' intent to starve Arboris of its supply of TOP and to take over its business.

168. In furtherance of the Defendants' plan, Defendants have employed deceptive and unfair practices, including but not limited to preventing Arboris from undertaking reasonable efforts to ensure its survival and continue as a viable going-concern in the Non-GMO Phytosterols Market. Arboris has suffered and will continue to suffer significant damages from Defendants' deceptive, unfair conduct, including but not limited to multiple millions of dollars in future lost revenues and profits.

169. The legal remedy of damages may not be sufficient in these circumstances to remedy the Defendants' improper conduct. If Defendants are not enjoined from their unfair and deceptive trade practices, Arboris will suffer irreparable harm.

WHEREFORE, Arboris, LLC demands judgment against Defendants, jointly and severally, for permanent injunctive relief, declaratory relief, and damages plus interest, costs, attorneys' fees, and such other relief as the Court deems just and appropriate.

## COUNT NINE
### Breach of the Operating Agreement

170.   Plaintiff incorporates its allegations in paragraphs 1 through 75 above and states further as follows.

171.   Arboris, Arizona-Arboris, and Arizona are parties to the Operating Agreement.

172.   Under Section 3.8 of the Operating Agreement, Arizona-Arboris and Arizona agreed not to compete with Arboris in its business of extracting, purifying, and selling phytosterols.

173.   In breach of this covenant, Arizona-Arboris and Arizona have taken action and are continuing to take action that competes with Arboris in this business. Defendants are not only currently establishing and promoting a competing phytosterols business of their own, but in doing so they are acting to destroy Arboris' future viability.

174.   Defendants' competitive conduct includes misappropriating the Arboris Technology, unjustly refusing to renew the TOPSA, threatening to oust Arboris from its plant, and vetoing Arboris' attempts to establish an alternate plant facility.

175.   Arboris has suffered and will suffer damages in the future from these breaches. Arboris is currently paralyzed with respect to long-term business planning and is unable to make future commitments without the ability to obtain a supply of TOP or to have

a facility within which to process it.  Arboris will also suffer significant damages in the future, including but not limited to multiple millions of dollars in future lost revenues and profits.

176.    The legal remedy of damages may not be sufficient in these circumstances to remedy Arizona-Arboris' improper conduct.  If Arizona-Arboris is not enjoined from its current competitive conduct, Arboris will suffer irreparable harm.

WHEREFORE, Arboris, LLC demands judgment against Arizona and Arizona-Arboris, jointly and severably, for permanent injunctive relief, declaratory relief, and damages plus interest, costs, attorneys' fees as provided in the contracts, and such other relief as the Court deems just and appropriate.

## COUNT TEN
### Fraud in the Inducement

177.    Plaintiff incorporates its allegations in paragraphs 1 through 75 above and states further as follows.

178.    Defendant, Arizona-Arboris is an owner of Arboris and has a fiduciary duty of utmost loyalty to Arboris.

179.    Prior to the time Arboris entered into the Arboris Agreements, Arizona-Arboris represented to Arboris (i) that it intended the Arboris venture to be a long term one to proceed for a period of at least 30 years; (ii) that its parent, Arizona, would supply Arboris' TOP needs during the period of the venture, (iii) that it would provide a Ground Lease on which Arboris could build a phytosterols extraction and processing facility that would last for

48

30 years, and (iv) that it and Arizona would keep the Arboris Technology confidential and would not use it except in the furtherance of Arboris' business.

180.    Further, Arizona-Arboris, which was in a fiduciary relationship with Arboris, never discussed with Arboris the position it is now taking, in violation of its fiduciary obligations to Arboris, that it intended it would be able to terminate the lease and thereby the entire venture in 2014 if its parent Arizona decided to cut off Arboris' supply of TOP and that it would then acquire for negligible cost all of Arboris' assets.

181.    In good faith reliance on its fiduciary's affirmative representations about the long term 30 year nature of the venture and its silence with regard to its currently asserted position regarding termination of the Ground Lease in 2014, Arboris entered into the Ground Lease, the TOPSA, and all the other Arboris Agreements and was induced to spend $65 million to build a state-of-the art phytosterols extraction and processing plant on Arizona's property.

182.    Likewise, Arboris entered into the Arboris Agreements, including the Contract Operations Agreement in good faith reliance on the Defendants' commitment and representations that Arizona-Arboris and Arizona would not use the Arboris Technology for their own benefit or the benefit of others.  Indeed, the only critical component Arizona previously lacked that prevented it from entering the phytosterols business itself was the technology that Arboris had.  But for Arizona-Arboris' representations of confidentiality and limited use, Arboris would never have entered into the Arboris Agreements or proceeded in any joint venture of any form with the Defendants.

183.   Defendants made these representations knowing them to be false at the time they made them and did so for the purpose of inducing Arboris to enter into the Arboris Agreements.

184.   Contrary to their representations, Defendants never intended to proceed with the Arboris joint venture for 30 years. Instead, Defendants intended to take the unreasonable position that they could arbitrarily terminate the Ground Lease and the Arboris venture in only 10 years, and intended to misappropriate the Arboris Technology.

185.   But for the Defendants' intentional misrepresentations, Arboris would not have entered into any of the Arboris Agreements nor disclosed its valuable intellectual property.

186.   Arboris has suffered and will continue to suffer significant damages from Defendants' fraudulent conduct, including but not limited to multiple millions of dollars in future lost revenues and profits.

187.   The legal remedy of damages may not be sufficient in these circumstances to remedy the Defendants' improper conduct. If Defendants are not enjoined from their misconduct, Arboris will suffer irreparable harm.

WHEREFORE, Arboris, LLC demands judgment against Defendants for permanent injunctive relief, declaratory relief, and damages and/or rescission of the Arboris Agreements, plus interest, costs, attorneys' fees, and such other relief as the Court deems just and appropriate.

## COUNT ELEVEN
### Constructive Fraud

188.   Plaintiff incorporates its allegations in paragraphs 1 through 75 and 178 through 185 above and states further as follows.

189.   Arizona-Arboris, as an owner of Arboris, owes a fiduciary duty to Arboris. Arboris reposed trust and confidence in Arizona-Arboris not to take advantage of Arboris for its own benefit or for the benefit of others, not to compete with Arboris, and not to misappropriate the Arboris Technology.

190.   Arizona-Arboris, together with the assistance of Arizona, has knowingly and intentionally abused the trust and confidence reposed in it to its own advantage and to the detriment of Arboris.

191.   Arboris has suffered and will continue to suffer significant damages from Defendants' abuse of trust, including but not limited to multiple millions of dollars in future lost revenues and profits.

192.   The legal remedy of damages may not be sufficient in these circumstances to remedy the Defendants' improper conduct.   If Defendants are not enjoined from their misconduct, Arboris will suffer irreparable harm.

WHEREFORE, Arboris, LLC demands judgment against Defendants for permanent injunctive relief, declaratory relief, and damages plus interest, costs, attorneys' fees, and such other relief as the Court deems just and appropriate.

> **VOLPE, BAJALIA, WICKES,**
> **ROGERSON & WACHS, P.A.**
>
> Timothy W. Volpe
> Florida Bar No.  358185
> Michael L. Duncan
> Florida Bar No. 50946
> Matthew P. McLauchlin
> Florida Bar No.  484180
> 501 Riverside Avenue
> 7th Floor
> Jacksonville, Florida  32202
> Telephone (904) 355-1700
> Facsimile (904) 355-1797
>
> Attorneys for Plaintiff