## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

ARBORIS, LLC,
a Delaware limited liability company,

      Plaintiff,

v.

ARIZONA CHEMICAL, LTD.,
a Bermuda limited company f/k/a
ARIZONA CHEMICAL COMPANY,
a Delaware corporation,
ARIZONA ARBORIS, INC.,
a Delaware corporation, and
GERALD C. MARTERER,

      Defendants.

_____/

CASE NO:  3:10-CV-179-J-25TEM

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

      Plaintiff, Arboris, LLC ("Arboris") sues Defendants, Arizona Chemical, Ltd.,

formerly known as Arizona Chemical Company ("Arizona"), Arizona Arboris, Inc.

("Arizona-Arboris"), and Gerald C. Marterer ("Marterer") and states:

### INTRODUCTION

      1.    Defendants, Arizona and Arizona-Arboris, are taking concerted, unfair and

anticompetitive action to destroy Arboris, a young company that has reached annual sales of

$50 million in "phytosterols," which are made from a tree chemical and used in cholesterol-

reducing drugs and heart healthy foods.  Defendant Marterer, the former President and Chief

1

Executive Officer ("CEO") of Arizona and Arizona-Arboris, was the chief promoter of the plan to destroy Arboris.

2.      On its face, Defendants' conduct seems illogical because Arboris is a joint venture in which Arizona itself holds a 10% minority ownership interest through its wholly-owned subsidiary, Arizona-Arboris.   Moreover, Arizona has profited substantially from Arboris' success since its initial operations began in 2004.

3.      The reason for Defendants' wrongful conduct is simple.   Arizona has seen Arboris' success and wants to take the business for itself.   Arizona is Arboris' exclusive supplier of the raw material, called tall oil pitch ("TOP"), that Arboris needs to manufacture phytosterols.   Indeed, because Arizona controls nearly half the world supply of TOP, Arizona itself has always been a natural competitor in the phytosterols market – but for one problem. Arizona failed in its own attempts to acquire and develop cost effective manufacturing technology to manufacture phytosterols, whereas Arboris was able to obtain a state-of-the-art technology to do so.

4.      Having failed to acquire the technology necessary to produce TOP-derived phytosterols, in 2001 Arizona leveraged its dominant raw material position to negotiate a 10% ownership position in the Arboris joint venture, without investing any capital.   While the express intent of the Arboris joint venture was for it to proceed for a period of at least 30 years, now that Arboris has achieved manufacturing and economic success, Arizona and Arizona-Arboris intend to destroy Arboris just 10 years from the time it became operational. The plan to destroy Arboris and take its business was formulated and carried out at the direction of Marterer and possibly others.   Marterer expressed, on multiple occasions,

2

Arizona's intent to "starve" Arboris of its raw material supply and take Arboris' business for itself. On at least one occasion, such statements were made in the presence of a representative of Rhone Capital, LLC, a venture capital firm that acquired a controlling interest in Arizona in 2007. To accomplish the plan, Defendants, together and in bad faith, have taken unjustifiable positions under the TOP supply agreement (the "TOPSA") and a ground lease to claim that Arizona can arbitrarily refuse to renew the TOPSA and, upon its expiration in 2014, can (i) cut off Arboris' supply of raw material, (ii) oust Arboris from its manufacturing facility, and (iii) acquire all of Arboris' phytosterol extraction assets for negligible cost. This is despite the mandate in Arboris' operating agreement that the joint venture is to proceed for a period of *30 years*.

5.     When Arboris became aware of Defendants' position in 2009, it first undertook repeated attempts to have Defendants repudiate their position. Being rebuffed, Arboris then sought non-judicial solutions, including exploratory efforts to build or purchase an alternate facility, to diversify its product offerings, or to contract manufacturing to other locations. Arizona-Arboris (the 10% owner of Arboris) reacted by vetoing and threatening to continue vetoing such efforts by Arboris to save itself from Defendants' plan of destruction, in blatant violation of Arizona-Arboris' fiduciary duties to Arboris.

6.     And finally, to perfect their plan to take the business for themselves, Defendants have also undertaken to misappropriate and misuse Arboris' intellectual property and technology.

7.     Arboris now brings this suit against Defendants for injunctive and declaratory relief and damages.

3

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 2, 18, 26 and 28 U.S.C. §§ 1331, 1337.  Additionally, as Plaintiff is seeking a declaration with respect to its rights and legal relations *vis-à-vis* Defendants and the controversy described herein, this action is additionally brought pursuant to 28 U.S.C. § 2201.

9.      Venue is proper in this Court pursuant to the agreements of the parties and pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391.

## THE PARTIES

10.     Arboris is a Delaware limited liability company with its principal place of business in Jacksonville, Florida. Arboris is the world's leading manufacturer and marketer of non-genetically modified phytosterols ("non-GMO phytosterols") and operates a phytosterol extraction plant in Savannah, Georgia and a phytosterol purification plant in Newark, Ohio.

11.     At all material times, Arizona Chemical Company was a Delaware corporation.  On or about February 12, 2010, Arizona Chemical Company became Arizona Chemical, Ltd., which is incorporated in Bermuda.  Throughout this complaint, Arizona Chemical Company and Arizona Chemical, Ltd. are referred to collectively as Arizona. Arizona currently resides and has its principal place of business in Jacksonville, Florida. Arizona has ten manufacturing locations in the United States ("U.S.") and in Europe and does business in most countries of the world.

12.     Arizona-Arboris is a Delaware corporation and is a wholly owned subsidiary of Arizona, with no dedicated staff, no manufacturing locations, and no business other than

4

with Arboris and with its parent. Arizona-Arboris' principal place of business is in Jacksonville, Florida.

13.     Marterer is the former President and CEO of Arizona and Arizona-Arboris. Marterer is and was at all times material a resident of Jacksonville, Florida. At all material times, Marterer was also a member of Arboris' Board of Managers and owed a fiduciary duty of utmost loyalty to Arboris. Despite such duties, Marterer, along with the other Defendants and possibly others, formulated the plan to destroy Arboris, take over Arboris' business, and carry out the tortious and anticompetitive conduct described herein.

## FACTS PERTAINING TO ALL CAUSES OF ACTION

### Pre-2001: Arizona Attempts but Fails To Develop Economically Viable Technology to Enter the "Non-GMO Phytosterols" Market

14.     Arizona's business is the manufacture of chemicals from raw material generated during the pulping of pine trees, and particularly crude tall oil ("CTO"). Arizona's primary business is based upon the chemical upgrading of organic acids contained in the CTO. The waste from a CTO chemical manufacturing process like Arizona's is TOP.

15.     Prior to 2002, Arizona typically sold its TOP, a combustible substance, to third parties as inexpensive fuel. Over many years, companies in the U.S. and in Europe (Arizona included) made attempts to derive value from TOP by trying, among other things, to render from it certain valuable chemical substances known as "phytosterols." Phytosterols, which have cholesterol-lowering qualities, can be used in a number of applications including pharmaceuticals, food products, dietary supplements and cosmetics.

16.     Phytosterols are not only derived from TOP, they can also be produced from by-products of soybean and rapeseed oil refining.  TOP-derived phytosterols are valuable in that they are not genetically modified ("non-GMO"), whereas soy-derived phytosterols are genetically modified.  A differentiated market exists for such non-GMO phytosterols.  For instance, throughout the European Union, genetically modified phytosterols are banned from food and pharmaceutical applications.  Food product and pharmaceutical manufacturers whose consumer products are sold in Europe must, by regulation, use non-GMO phytosterols, such as those derived from TOP.  The non-GMO phytosterols market is desirable because non-GMO phytosterols typically command a higher price and serve different functions than genetically modified phytosterols.

17.     Because of the great potential profits to be made from pine-derived non-GMO phytosterols, between 1994 and 1997 Arizona licensed a non-GMO phytosterol technology from a Swedish consortium known as "Triple Crown" and produced pilot quantities of non-GMO phytosterols at its Panama City, Florida location.  During this time, Arizona made commercial proposals to sell its non-GMO phytosterols to Upjohn, a pharmaceutical user of phytosterols.

18.     However, Arizona's efforts using the Triple Crown technology failed due to the high cost of the extraction chemicals and difficulty achieving competitive quality standards.  The phytosterols Arizona produced using the Triple Crown technology were only suitable as low grade raw material for certain pharmaceutical processes.  Around 1997 or 1998, Arizona allowed the Triple Crown license to lapse.

19.     Although it wanted to enter the non-GMO phytosterols market, Arizona was not able to independently develop that business. Thus, prior to the Arboris operation, TOP was primarily a low margin product for Arizona sold for its fuel value.

### 2001: Härting Develops Economically Viable Technology for the Production of Non-GMO Phytosterols

20.     In 2001, a Chilean businessman and inventor, named Thomas Härting ("Mr. Härting"), developed and patented a unique chemical process (the "Härting Sterol Process") and demonstrated and validated the process at a semi-commercial scale pilot plant. The Härting Sterol Process resolved a number of the technical and economic obstacles that Arizona and others had faced. This created a new and potentially lucrative use for TOP.

21.     Following development of the Härting Sterol Process, Mr. Härting began exploring the potential formation of a business to manufacture and market non-GMO phytosterols. To form such a business, Mr. Härting needed a sufficient, steady supply of TOP.

### Arizona Leverages its Control over TOP to Acquire a Minority Ownership Interest in Mr. Härting's New Venture and Gain Access to the Arboris Technology

22.     Mr. Härting's choices for a TOP supplier were few. The worldwide market for the supply of TOP for the production of non-GMO phytosterols is oligopolistic and highly concentrated. Mr. Härting initially explored a Chilean-based joint venture with non-GMO phytosterol customers, but the availability of Chilean CTO, and thus TOP, was insufficient. Currently, only four companies in the world produce TOP in quantities sufficient to supply an economic scale non-GMO phytosterols operation. Those four

7

companies are MeadWestvaco Corporation ("MWV"), Georgia Pacific Corporation ("GP"), Forchem Oy ("Forchem") and Arizona.  Of the four, Arizona controls most of the worldwide production, with 47% of the aggregate TOP production.

23.    Knowing that Arizona controlled most of the worldwide supply of TOP in 2001 and 2002 and that that situation was not likely to change, Mr. Härting engaged in discussions with Arizona about Arizona supplying his new business with TOP.

24.    However, when Arizona learned of Mr. Härting's new cost-efficient technology, the advanced stage of Mr. Härting's negotiations for take-or-pay contracts with two large potential customers, and consequently the potentially lucrative new market to be created from its heretofore cheap and abundant waste by-product, Arizona was no longer interested in merely selling its TOP to Mr. Härting at the going market (fuel) rate.

25.    While Arizona had neither the intellectual property, the specialized facility required to extract phytosterols from TOP, nor potential contracts with customers willing to enter into long term supply agreements, what it possessed was great market control over the supply of TOP.  It now wanted to join in the potential profits of this new phytosterols market.

26.    Arizona clearly appreciated the potential added value the Härting Sterol Process could bring to its formerly low-value TOP.  Additionally, knowing its own ability to wield control over the worldwide supply of TOP, Arizona would not settle for a simple supply agreement.  Instead, in exchange for agreeing to supply TOP to Mr. Härting (thus addressing the raw material vulnerability) Arizona devised a "joint venture" between Mr. Härting and Arizona to manufacture and market non-GMO phytosterols.  The venture would become Arboris, LLC.

27.     Unfortunately, while Arizona spoke in terms of a "joint venture," Arboris has recently discovered that Arizona's hidden intent for obtaining an ownership interest in Arboris was only to gain access to Arboris' technology, misappropriate it, cut off Arboris' supply of TOP, and then enter the non-GMO phytosterols market itself, as it had tried unsuccessfully to do for years.

28.     A former Arizona insider has recently reported that, throughout Defendants' relationship with Arboris, Marterer internally expressed on multiple occasions that it was Arizona's true intent to "starve" Arboris of its raw material supply and to soon enter the non-GMO phytosterols business itself, without Arboris.  On at least one occasion, such statements were made in the presence of a representative of Rhone Capital, LLC, a venture capital firm that acquired a controlling interest in Arizona in 2007.

29.     It has been discovered that, behind the scenes at Arizona, Marterer actively drove Defendants' plan to destroy Arboris and take its business for Arizona.  Even while he was acting as a member of Arboris' Board of Managers, Marterer was actively trying to take measures to damage and destroy Arboris.  At one point, Marterer even threatened to make Arboris' operation untenable by cutting off its waste water services, which alone caused Arboris significant damage because Arboris had to detach a team from current operations, engage outside engineering help and negotiate with the City of Savannah for waste water treatment.  As a result of these actions, Arboris' key employees were distracted from their normal priorities and Arboris was forced to expend significant amounts and scramble to arrange for an alternate means of wastewater treatment.

### July 5, 2001: Arboris Joint Venture is Formed

30.     Based on Arizona's representations of interest in a long-term joint venture, on July 5, 2001, Arboris was formed. Its original members were Arboris Roots Corporation ("Arboris Roots," Mr. Härting's affiliate) and Arizona-Arboris (Arizona's wholly-owned subsidiary).

31.     Between July 5, 2001 and July 30, 2002 the parameters of the joint venture were discussed and agreed upon. The venture was to be for a lengthy term – to proceed for a period of 30 years. In this regard, Arizona-Arboris would provide Arboris a rent-free, 30 year lease of vacant land owned by Arizona (adjacent to Arizona's facility) on which Arboris could build its plant. In turn, Arizona-Arboris executed a mirror lease with its parent, Arizona.

32.     In exchange for these limited contributions, Arizona-Arboris would acquire a 10% minority ownership interest in Arboris and assume a seat on Arboris' Board of Managers. Arizona-Arboris would also acquire a call option to purchase up to an additional 30% ownership interest in Arboris, but to date, it has not exercised such option. Arizona-Arboris would make no capital contributions to Arboris nor undertake any other risk. Arizona also required that it exclusively supply all of Arboris' TOP requirements. In contrast to the minimal contributions by Arizona and Arizona-Arboris, Mr. Härting's affiliate, Arboris Roots, would assume all of the capital, technology and market risk in exchange for 90% of the membership units in Arboris. Presently, Arboris Roots owns 60% of the membership units in Arboris, while another Härting affiliate, "Arboris Leaves," owns 30% of the membership units.

33.     Arboris Roots alone would finance the capital investment (approximately $65 million) to build and equip a state-of-the-art phytosterol extraction plant on Arizona's property in Savannah (the "Arboris Plant"), and a later phytosterol purification plant at Newark, Ohio.   Arboris would also pay Arizona-Arboris for the performance of certain contract operations at the Arboris Plant, which Arizona-Arboris subcontracted to Arizona.

34.     With regard to the proposed exclusive supply agreement between Arboris and Arizona (which ultimately became the TOPSA), Arizona was to derive extraordinary profit. Arizona would supply TOP to Arboris from its North American plants, but would never relinquish ownership of the TOP to Arboris.   Rather, Arboris would be obligated to (i) return to Arizona the TOP remaining after the extraction of the phytosterols (about 90% of the incoming TOP) and (ii) pay Arizona for the 10% volume of TOP consumed during the phytosterol extraction process at an amount that was three times the 2002 fuel value price. Arizona would retain the right to re-sell the TOP after extraction of phytosterols for fuel value.

### July 30, 2002: Arboris Agreements Confirm and Establish a Long Term 30 Year Joint Venture

35.     Approximately a year following formation of the Arboris joint venture, Arboris, Arizona, and Arizona-Arboris entered into a series of written agreements relating to Arboris.  These agreements are herein referred to collectively as the "Arboris Agreements" which included, among others, a "Contribution Agreement" (**Exhibit A**), an "Operating Agreement" (**Exhibit B**), a Supply and Processing Agreement or the "TOPSA" (**Exhibit C**), a "Contract Operations Agreement" (**Exhibit D**), and a "Ground Lease" (**Exhibit E**).

11

36.     Consistent with the members' prior agreement, the stated purpose of the Arboris joint venture was for the operation of a phytosterols extraction and purification plant in Savannah, Georgia, the sale and supply of phytosterols and Arboris Non Sterol Materials generated from the processing of TOP and such other related activities.  Arboris was to operate such a business and sell phytosterols for a long term period of at least 30 years. Subsequent to the execution of the Operating Agreement, Arboris also began operating an additional facility in Newark, Ohio for the purification of phytosterols.

37.     The Operating Agreement expressly mandated a 30 year venture, stating that the "Term of the Company *shall...continue* until dissolved upon the occurrence of an event set forth in Section 9.1," which paragraph establishes that the term is to be "*[t]hirty (30) years* from the date hereof" unless earlier dissolved by (i) "the happening of any event of dissolution specified in the Certificate of Formation" (which document specified no dissolution events); (ii) "the entry of a decree of judicial dissolution" pursuant to Delaware law, or (iii) "the vote of all the Members."

38.     Consistent with the 30 year duration for the Arboris joint venture, the Ground Lease also logically had a 30 year term so that, during the term of the joint venture, Arboris would always have a plant site on which it could operate its phytosterols business.

### 2004 to Present: Arboris is Profitable and Captures a Large Share of the Non-GMO Phytosterols Market

39.     By mid-2004, Arboris was fully operational.  Despite the high premium Arboris was paying Arizona for its TOP, Arboris was nevertheless very profitable.  As of late 2009, Arboris was able to overcome risks and deliver on its business model.  It has captured

approximately 60% of the world non-GMO phytosterols market (80% of the TOP derived non-GMO phytosterols) and approximately 35% of the world phytosterols market overall.

40.    Due to Arboris' success, Arizona has also profited handsomely under the terms of the TOPSA.  From the beginning of operations in mid-2004 through the end of calendar year 2009, Arboris paid Arizona approximately $29 million in TOP fees, which includes approximately $25 million of premium over the market (fuel) value of TOP.  During that same time period, Arboris paid Arizona-Arboris millions of dollars for its services in operating the Arboris Plant.

### 2009: Arboris Seeks to Renew the TOPSA but Arizona Refuses to Negotiate

41.    With the business transitioning to a stable mode, delivering $20-25 million per year (including royalties, fees and EBITDA), in 2009 Arboris sought to renew the TOPSA and renegotiate the price it was paying for TOP.

42.    Although the Operating Agreement expressly required that the joint venture proceed for 30 years and the Ground Lease term was also 30 years, the TOPSA's initial term was only 10 years but expressly called for renegotiation and multiple renewals on a more frequent basis.  The purpose of the shorter initial term of the TOPSA with frequent renewals was to permit the parties to renegotiate and reset the TOP price to keep it relative to market prices and conditions.

43.    Accordingly, in 2009 Arboris approached Arizona several times to renegotiate and renew the TOPSA.  With the significant return on investment Arizona was realizing under the TOPSA, Arboris expected that Arizona would be eager to lock in a favorable price for TOP going forward.  However, this was not the case.

44.     On June 16, 2009, at a meeting of Arboris' Board of Managers, Arboris' Executive Vice President, Manuel Canales ("Mr. Canales"), brought up the subject of renegotiating the price of TOP and renewing the TOPSA.  Kees Verhaar ("Mr. Verhaar"), Arizona-Arboris' representative on Arboris' Board of Managers and also the President and CEO of Arizona who had succeeded Marterer, stated that the TOPSA did not end until July 2014 and that Arizona would not even begin negotiating the terms of the TOPSA until mid-2012.  Arboris repeatedly informed Arizona and Arizona-Arboris that the current refusal to negotiate and renew the TOPSA was damaging Arboris' ability to make long term plans and commitments.  Arizona refused to respond.

45.     Because the refusal to negotiate was damaging Arboris' ability to make future plans, Arboris made multiple additional attempts to renegotiate the TOPSA with Arizona throughout the remainder of 2009 and early 2010.  However, each attempt to renegotiate was rebuffed by Arizona and Arizona-Arboris, which continued to contend it was "too early" to renegotiate despite the contractual requirement to do so.  In discussions between Mr. Verhaar of Arizona and Mr. Canales of Arboris during the third quarter of 2009, Mr. Canales repeatedly requested a time and venue for "businessman and legal counsel level discussions" regarding revision of the TOPSA terms and conditions.  Arizona did not respond to those requests.

46.     Arboris began to suspect, and later determined, that Arizona's plans were to not renew the TOPSA at all.

14

**Defendants Plan to Terminate the TOPSA, Acquire the Arboris Plant,
and Eliminate Arboris as a Competitor in the Non-GMO Phytosterols Market**

47.     While Arizona's stated reason for refusing to renegotiate the TOPSA was that it was "too early," Arboris has now learned that Arizona's refusal has no legitimate purpose and is, in fact, a bad faith attempt to destroy Arboris.

48.     Despite the fact that the Arboris joint venture is intended to proceed for 30 years, Defendants are now together taking the unjustifiable position that in 2014 Arizona can arbitrarily refuse to renegotiate the TOPSA, thereby (i) artificially hastening the end of the Ground Lease after only 10 years and (ii) simultaneously triggering an asserted right under the Ground Lease for Arizona-Arboris to acquire all of Arboris' phytosterol extraction assets (for negligible cost).

49.     Defendants' position is that, while the term of the Ground Lease is 30 years, it includes a provision calling for early termination upon certain conditions, one of which is the expiration or termination of the TOPSA.  Defendants are asserting that this linking of the term of the Ground Lease to that of the TOPSA allows Arizona the ability to force the Ground Lease's early termination by arbitrarily refusing to renegotiate and renew the TOPSA.  In that event, Defendants contend, Arizona-Arboris can not only truncate the Ground Lease to 10 years, but it can also then acquire all of Arboris' phytosterol extraction assets (except its intellectual property) under a provision in the Ground Lease allowing the landlord, at its sole discretion, the option to acquire (at the nearly fully depreciated value) all of the improvements made on the premises during the lease. Defendants contend that this

would include Arboris' plant, equipment, and fixtures, essentially all of Arboris' phytosterol

extraction assets. The Ground Lease states:

> Tenant shall . . . at Landlord's option . . . convey all improvements, tangible personal property and equipment and fixtures thereon in the same condition as existed as of the date of installation, acquisition or construction of such improvements, equipment and fixtures . . . for a purchase price equal to its then current book value.

Ground Lease, ¶ 6.4.

50.     While this purchase option makes sense in the context of the long-term 30

year venture, at the end of which the Arboris Plant would be near the end of its useful life,

Defendants are attempting, through Arizona's arbitrary refusal to currently renew the

TOPSA, to achieve an unintended windfall and to simultaneously completely eliminate the

Arboris joint venture just 10 years from its inception and while the Arboris Plant is still

relatively young. Further, Defendants' position that they could acquire Arboris' proprietary

and confidential trade fixtures through the purchase option would be contrary to the Contract

Operations Agreement and would improperly allow the unlicensed use of the Arboris

Technology.

51.     Defendants' position contravenes the very purpose and intent of the Arboris

joint venture and leads to nonsensical, unjust, and unconscionable results. Despite

Defendants having taken no financial risk in Arboris, under Defendants' plan, Arizona's

unilateral refusal to renew the TOPSA without cause would allow Arizona-Arboris, just 10

years after Arboris became operational, to oust Arboris from its fully functioning, $65

million state-of-the-art phytosterols plant. Under the Defendants' plan,  with Arboris having

16

no raw material and no extraction plant, Defendants seek to effectively capture and take over Arboris' business, market share, and its $50 million to $60 million a year revenue stream for themselves.

52.    Defendants' position is contrary to and violates the clear mandate, purpose and intent of the Operating Agreement, which provides that Arboris shall operate the phytosterols extraction and processing facility in Savannah, Georgia *for a period of 30 years.* This business cannot be terminated earlier unless there is either an earlier event of dissolution or a vote of the members that cuts short the 30 year term - none of which events has occurred.  Defendants' position is also at odds with the Contract Operations Agreement and would violate trade secret law, as obtaining Arboris' proprietary trade fixtures through the Ground Lease purchase option would improperly allow for the unlicensed use of Arboris' intellectual property.

53.    Indeed, without a plant through which Arboris can process TOP and extract non-GMO phytosterols, a main purpose of the Operating Agreement is thwarted and Arboris' reasonable contractual expectations are unfairly denied.  Moreover, Arizona-Arboris and Arizona would be unjustly enriched.

54.    Again, in contrast to the longer term of the Ground Lease, the shorter term of the TOPSA, with the ability to renew it for successive periods on mutually agreeable terms, was intended merely so that the price being paid for the TOP supply could, in a reasonable number of years and from time to time, be renegotiated and re-set to reflect current market conditions.  The shorter term of the TOPSA was never intended to be used as a trap with which to undo the Operating Agreement and Ground Lease and destroy Arboris by 2014.

### Arboris First Seeks Practical, Non-Judicial Solutions to
### Ensure its Survival; Arizona-Arboris "Vetoes" These Attempts

55.     As unreasonable as Defendants' position and conduct have been, Arboris first considered and sought non-judicial means to resolve the situation.  It made efforts toward building an alternate plant facility, buying competitors in other locations, and diversifying its product offerings.

56.     However, in blatant violation of its fiduciary obligations to Arboris, Arizona-Arboris has "vetoed" all attempts by Arboris to save itself and has vowed to continue to do so.

57.     On September 11, 2009, Arboris and Arizona held a meeting to discuss Arboris' plans to build an alternate plant site that could be operational at the end of the TOPSA.  Mr. Verhaar and Gary Reed of Arizona were present.  Mr. Verhaar stated at this meeting that Arizona-Arboris would simply exercise its "veto" if Arboris undertook any efforts to try to build an alternate plant site, on the grounds that building an expensive new plant would be corporate "waste."  Mr. Verhaar gave only hollow assurances that Arboris should have confidence that the TOPSA issues would be resolved, while simultaneously refusing to renegotiate renewal of the TOPSA.

58.     Arizona-Arboris derives this extraordinary "veto" power from two provisions in the Operating Agreement. The first provides that the "Purpose and Business of the Company" is the "ownership and operation of a phytosterols extraction and purification plant located in Savannah, Georgia and the sale and supply of phytosterols and Arboris Non Sterol Materials . . . as defined in the [TOPSA]." This provision expressly provides that "without

18

the *unanimous consent* of the Members," Arboris cannot engage in any other business. Thus, any efforts by Arboris to erect or purchase an alternate plant must be approved by Arizona-Arboris, which has demonstrated that it has only Arizona's best interests in mind. Likewise, the Operating Agreement also provides that Arboris is prohibited from expending capital or incurring debt in excess of certain minimal amounts without the *unanimous approval* of the Members.   This provision also effectively allows Arizona-Arboris to block any significant effort by Arboris to purchase or build an alternate facility, which would necessarily require significant expenditure above minimum amounts.

59.   This "veto" power and right of control over Arboris is vastly disproportionate to Arizona-Arboris' minority ownership interest and is being used against Arboris unfairly and anticompetitively.  Further, the manner in which Arizona-Arboris, an *owner* of Arboris, is exercising this veto is an unjustifiable violation of its fiduciary duty of loyalty to Arboris.

**Arizona-Arboris Vetoes Arboris' Attempt to Purchase Alternate Facility**

60.   Not only has Arizona-Arboris vowed to veto any future attempt by Arboris to build an alternate plant, Arizona-Arboris has used its veto to thwart at least one previous bid by Arboris to purchase a competing business.

61.   In December 2008, Arizona-Arboris impeded the acquisition of Phytosource, Arboris' major non-GMO phytosterol competitor, by use of its veto power.  The purchase of Phytosource was clearly in Arboris' best interests, as it would have allowed Arboris an additional alternate facility to continue its phytosterols extraction operations beyond the current location of the Arboris Plant.  However, Arizona-Arboris vetoed the deal in order to effectuate Arizona's goal of eliminating Arboris as a competitor.  This veto was particularly

19

damaging to Arboris because, as it turned out, one of Arboris' largest customers ultimately bought Phytosource.  As a result, Arboris' failure to consummate the Phytosource purchase was a double loss for Arboris - the loss of the facility and the loss of the business.

**Arizona-Arboris Vetoes Arboris' Attempt to Develop Alternative Products**

62.    For similar reasons, Arizona-Arboris vetoed Arboris' attempts to diversify its product offerings into "dispersible sterols technology."  This technology would have created an avenue for Arboris to grow into an expanded market position and to stay in business beyond 2014, even if Arizona-Arboris took over the Arboris Plant.

63.    Arboris was offered an opportunity whereby a third-party would license the dispersible technology to Arboris, subject to the TOPSA being in force.   Again, this would have financially benefitted Arboris, yet Arizona-Arboris purposely used its veto power to impede the license, resulting in a termination of this opportunity.

64.    Thus, while simultaneously threatening to exercise its asserted right in 2014 to cut off Arboris' TOP supply and acquire all of its phytosterol extraction assets, Defendants, through Arizona-Arboris, are also abusing the "veto" power to prevent Arboris from expanding its operations to save its business from destruction.  If unstopped, Defendants will unfairly accomplish the unnecessary elimination of Arboris through the acquisition of its thriving multi-million dollar business for nearly no cost and succeed to a dominant 60% worldwide market share in the non-GMO phytosterols market.

**Arizona, Arizona-Arboris and Marterer
Attempt to Steal Another Arboris
Business Opportunity Involving Policosanols**

65.     At some point, Arboris' management also began looking into business opportunities involving policosanols, an "other neutral" that Arboris believed could be extracted from TOP.  Policosanols fit within Arboris' business plan, as policosanols are natural plant extracts that, when used as a food supplement, are believed to lower bad cholesterol (LDL) and increase the good cholesterol (HDL) in humans.

66.     In or about 2006, Marterer learned of Arboris' interest in policosanols in his discussions with Arboris' management at meetings of Arboris' Board of Managers and knew that this was a business opportunity in which Arboris was interested.

67.     Marterer represented to the other members of Arboris' management team that, if any policosanol opportunity presented to Arizona, then he would bring such opportunity to Arboris for consideration.

68.     Contrary to this representation and in violation of his fiduciary duties owed to Arboris, Marterer created a team within Arizona for the purpose of pursuing policosanol opportunities.  As a result, Arboris' policosanol opportunities were usurped when Arizona pursued the policosanol business through a joint venture it entered into with Danisco, a provider of food ingredients, bio-based ingredients, and enzymes.

69.     While the actions of Marterer and Arizona with regard to the policosanol opportunity have not, to Arboris' knowledge, yet resulted in damage to Arboris, their conduct is demonstrative of Defendants' bad faith actions, willful misconduct, and desire and intent to cause harm to Arboris.

**Defendants Obtain the Final Component,
the Intellectual Property, By Simply Taking It**

70.     While obtaining the Arboris Plant is a key component of Defendants' plan,

acquisition of Arboris' technology and intellectual property is equally as important.   The

agreements discussed below prohibit Defendants from using the "Arboris Technology" other

than for the purpose of Arboris' operations, yet Defendants have undertaken to simply

misappropriate it.

71.     This is in direct violation of Defendants' promises, representations, and duties

to Arboris.   Under the Contract Operations Agreement, Arizona-Arboris was granted *limited*

rights to use the Arboris Technology for the purposes of furthering Arboris' business and that

agreement.   Paragraph 4.1 of the Contract Operations Agreement provides:

> Arboris hereby grants to AAI a non-exclusive, non-transferable,
> worldwide, paid-up, royalty-free, irrevocable license during the
> Term to use, reproduce and modify the *Arboris Technology*
> provided to AAI by Arboris *exclusively in connection with the*
> ***Services*** *and the **Proje**ct.*

Contr. Ops. Agr., ¶ 4.1.

72.     Under the Contract Services Agreement (**Exhibit F**), Arizona-Arboris

contracted with Arizona to perform the work required under the Contract Operations

Agreement.   The Contract Services Agreement similarly contains a Paragraph 4.1 under

which Arizona-Arboris granted Arizona a similar license to "use, reproduce and modify the

Arboris Technology provided to Arizona-Arboris by Arboris *exclusively in connection with*

*the **Services** and the **Project**.*"

22

73.     The "Services" defined under the Contract Operations Agreement are the "Contract Services, Additional Services and any other mutually agreed services provided by AAI to Arboris *under this Agreement*." <u>Contr. Ops. Agr.</u> ¶ 1.2(18).  The "Project" is the "operation and management of a plant within Arizona's Savannah, Georgia site to extract and purify sterols generated from the processing of [TOP]." <u>Contr. Ops. Agr.</u> ¶ 1.2(14).  These terms are similarly defined in the Contract Services Agreement between Arizona-Arboris and Arizona.

74.     The "Arboris Technology" licensed under both the Contract Operations Agreement and Contract Services Agreement includes:

> (i) evaluation, technical, scientific, regulatory, engineering, architectural, marketing, financial and business information, data, reports, designs, plans, studies, drawings, diagrams, flow charts, and any and all intellectual property rights thereto; and (ii) works of authorship, software, databases, hardware, equipment, formulae, compositions of matter, processes, products, articles of manufacture, and any and all intellectual property rights thereto.
>
> <u>Contr. Ops. Agr.</u>, ¶¶ 1.2(3) and (17)

75.     The Contract Operations Agreement and the Contract Services Agreement require Arizona-Arboris and Arizona to each maintain in confidence all "Confidential Information," which includes the Arboris Technology.  These agreements also prohibit disclosure of the "Confidential Information" to unauthorized persons or its use, except in connection with the Services and the Project.  Both agreements provide that Arizona and Arizona-Arboris are to:

> exercise reasonable efforts to ensure that Authorized Persons . . . maintain the Confidential Information in strict confidence and

23

refrain from using and duplicating the Confidential Information, except during the Term and *exclusively for purposes of supporting the Receiving Party and/or the Disclosing Party in connection with the Services and Project.*

Contr. Ops. Agr., ¶ 4.5.
Contr. Svc. Agr., ¶ 4.5.

76.     Defendants' obligations to use the Arboris Technology only in connection with these agreements and to preserve Arboris' Confidential Information were material inducements for Arboris to enter into the Arboris Agreements and to disclose the Arboris Technology to Defendants.

77.     Arboris has recently learned that, despite their promises, Defendants, at the direction of Marterer, assigned teams to undertake concerted efforts to study and find ways of circumventing, modifying, and working around the Arboris Technology so that Arizona and Arizona-Arboris could misappropriate the Arboris Technology for their own use after Arboris had been evicted from the Arboris Plant.  These efforts were led, in part, by a person named David Garrett at Marterer's direction.

78.     Defendants' misappropriation of Arboris' Confidential Information and the Arboris Technology unfairly undermines and frustrates the bargain reached by the parties, violates established trade secret law, violates the duties of good faith and fair dealing, violates the duties of loyalty owed to Arboris, and breaches contractual duties and obligations owed to Arboris.

**Arizona and Arizona-Arboris Represent to Arboris
that Arizona Plans to Exit the Phytosterols Business and Sell its Interest in Arboris**

79.     On February 18, 2010, Arboris notified Arizona and Arizona-Arboris in writing of Arboris' intent to initiate suit if Arizona did not either commit to (i) selling Arboris the Arboris Plant site and terminating the Ground Lease or (ii) disavowing, in writing, their position that a termination of the TOPSA would cause an automatic termination of the Ground Lease and agreeing, in writing, to de-link the TOPSA from the Ground Lease.

80.     In response to Arboris' correspondence, Mr. Verhaar contacted Mr. Canales, Mr. Jaime Santa Cruz (a member of Arboris' Board of Managers), and Mr. Härting by phone on February 19, 20, and 21, 2010.  During these telephone conversations, Mr. Verhaar stated multiple times that Arizona had just completed a survey on the phytosterols business and, as a result of that study, it was no longer very optimistic about the future of the phytosterols industry.  In addition, Mr. Verhaar stated that, because of this study, Arizona was no longer willing to increase its participation in Arboris and would not exercise its call option under the Operating Agreement.  He also stated that Arizona was not willing to waste any further time on Arboris because it had many other projects to develop.

81.     Consistent with these statements made to Mr. Canales, Mr. Santa Cruz, and Mr. Härting, during a telephonic meeting of Arboris' Board of Managers on February 22, 2010, Arizona and Arizona-Arboris officially represented to Arboris, through Mr. Verhaar, that Arizona had recently determined that the prospects of the phytosterols business were no longer attractive to Arizona and that Arizona was prepared to sell Arboris the Arboris Plant site, sell its interest in Arboris, sell its call option under the Operating Agreement, and either

25

continue or terminate the TOPSA.   In response to this new approach by Arizona, Mr. Canales and Mr. Härting expressed a willingness to negotiate promptly along those lines.

**Arizona Takes Action At Odds with
Its Representations at the Meeting of Arboris' Board of Managers**

82.     Arboris promptly made a proposal to Arizona and Arizona-Arboris to purchase the Arboris Plant site, their interest in Arboris, and the call option under the Operating Agreement, but to continue the TOPSA until 2014.

83.     Contrary to Arizona's representation that the phytosterols business was no longer attractive to Arizona, Arizona's counterproposal gave no indication of any real willingness to exit the phytosterols business.  Rather, Arizona demanded an extension of the TOPSA, but on new terms that are even more onerous than the current terms of the TOPSA.  Further, while Arizona offered to sell the Arboris Plant site, its interest in Arboris, and its call option, Arizona's asking price was an extraordinary $25 million, which is well above a fair valuation of such property interests.

84.     Then, in further contradiction to Arizona's representations to Arboris at the February 22, 2010 meeting of Arboris' Board of Managers, on April 12, 2010, Arizona filed a Form S-1, in connection with its initial public offering, in which Arizona disclosed no intention to exit the phytosterols business or to sell its interests in Arboris.  Instead, the Form S-1 filed by Arizona describes Arizona as a leading global supplier of pine-based, non-genetically-modified sterols through its joint venture with Arboris.

85.     Arboris now brings this suit against Defendants for injunctive and declaratory relief and damages.

26

86.     All conditions precedent to this action have been met, have been waived, or have occurred.

87.     Arboris has retained the undersigned law firm to enforce its rights in this suit and has agreed to pay a reasonable fee for its services.  Pursuant to the Operating Agreement, the Ground Lease, the TOPSA, 15 U.S.C. § 15, and Sections 688.005 and 501.2105, Florida Statutes, Arboris is entitled to recover its reasonable attorneys' fees, costs, and expenses.

## COUNT ONE
### Violation of the Clayton Act, Section 7, 15 U.S.C.A. § 18

88.     Plaintiff incorporates its allegations in paragraphs 1 through 87 above and states further as follows.

89.     Through a purchase option contained in the Ground Lease, Arizona threatens to acquire the physical improvements Arboris made on the leased premises, which effectively includes substantially all of Arboris' physical assets for the extraction of phytosterols, including the entire Arboris Plant.

90.     Arizona's anticipated acquisition of Arboris' assets at the Arboris Plant is designed to eliminate Arboris as a competitor in the relevant market, the effect of which will be the substantial impairment or lessening of competition.

91.     The relevant market for purposes of determining the anticompetitive and monopolistic consequences of Defendants' effective acquisition of Arboris is the market for the manufacture, distribution, and sale of non-GMO phytosterols in the U.S. and Europe (the "Non-GMO Phytosterols Market"), which is part of the trade or commerce among the several states and the trade or commerce with foreign nations.

92.    The Non-GMO Phytosterols Market is already oligopolistic and highly concentrated, having only two currently significant worldwide competitors, Cognis and Arboris.    Arboris has 60% of the Non-GMO Phytosterols Market and Cognis has approximately 30%.  Of the non-GMO phytosterols produced from TOP, Arboris has 80% of the market.    Other than Arboris, only Cognis has the technology and facilities to commercialize non-GMO phytosterols from TOP.  Cognis does not have a captive TOP supply and must therefore purchase TOP at arm's length from MWV and GP.

93.    The market for the supply of TOP as a raw material for the production of phytosterols is also oligopolistic and highly concentrated, having only three U.S.-based and one Finland-based worldwide competitors.

94.    Arizona is a well-equipped and well-financed corporation engaged in the same or related lines of commerce as Arboris and is preparing to enter this oligopolistic market. As such, Arizona is either (i) an actual substantial direct competitor of Arboris (although currently prohibited by agreement from competing due to its involvement in the Arboris joint venture), (ii) an actual potential *de novo* competitor of Arboris, or (iii) a perceived potential *de novo* competitor of Arboris in the Non-GMO Phytosterols Market.

95.    There is a reasonable probability that Arizona would have entered the Non-GMO Phytosterols Market in the near future, independently of any effective acquisition of Arboris, either through *de novo* entry or a toehold merger.  The facts supporting this include, but are not limited to, the following:

      a.  Prior to Mr. Härting's invention of the Härting  Sterol Process and the formation of Arboris, Arizona made its own attempts to render phytosterols

28

from TOP in a commercially viable manner. If Arizona had not failed to achieve a commercially viable method of rendering phytosterols from TOP, it would have entered the market on its own.

b. Arizona demonstrated its intent to enter the market independently by undertaking to misappropriate the Arboris Technology and by the positions it is taking under the TOPSA and Ground Lease.

c. Arizona's former President and CEO, Marterer, stated to former Arizona insiders, on a number of occasions, that it was Arizona's desire to starve Arboris of its TOP supply, take over its business, and manufacture phytosterols itself without Arboris.

d. By virtue of its involvement in and ownership of a percentage of Arboris, Arizona is already, to some extent, directly engaged in the non-GMO phytosterols business and receives a steady stream of revenues from the sale of non-GMO phytosterols.

e. Defendants acknowledged their status as potential future competitors in the Non-GMO Phytosterols Market by signing a non-competition provision in the Operating Agreement.

f. Arizona has a unique incentive to enter the Non-GMO Phytosterols Market because, as the largest single producer of TOP, it would have no raw material costs, thereby dramatically increasing its profit from the sale of phytosterols.

g. There are no financial impediments to Arizona entering the Non-GMO Phytosterols Market, as Arizona is a large, well financed worldwide chemical

manufacturing enterprise. Arizona's supply of TOP is occasioned by its development of a host of other pine derived chemicals, which Arizona produces and distributes throughout the world. Arizona is thus well positioned to add another chemical substance to its existing worldwide distribution network.

h.  Arizona has firsthand knowledge, through its involvement with Arboris, of how to successfully manage and operate a worldwide non-GMO phytosterols manufacturing, marketing, and distribution business.

i.  Arizona currently supplies Arboris with the pool of skilled labor that operates the Arboris Plant and, as a result, has gained knowledge on how to successfully operate a non-GMO phytosterols extraction facility.

j.  Arizona has expressed its intent to enter the non-GMO phytosterols business in its statements to third parties.

96.  With Arboris eliminated from the Non-GMO Phytosterols Market through acquisition, Defendants would naturally capture either all or the vast majority of Arboris' market share because:

a.  The elimination of Arboris, with its 60% Non-GMO Phytosterols Market share (80% of TOP based), would leave a massive unfilled gap in the worldwide market to supply customers with non-GMO phytosterols, a void that Cognis and others would be unable to fill absent major new capital expansion.

b.  Defendants would quickly be able to seamlessly take over where Arboris left off, (i) having acquired Arboris' state-of-the-art facility, (ii) employing the same knowledgeable and skilled workforce currently running the Arboris Plant, and (iii) having full knowledge of the customer base.

c.  With years of accrued knowledge regarding Arboris' customers, distribution networks, and marketing and sales practices, Defendants would naturally be able to capture most, if not all, of Arboris' market share of the Non-GMO Phytosterols Market. Arboris' customers, which already perceive Arboris as a "joint venture" that includes Arizona, would likely perceive no real difference in buying phytosterols from Defendants instead of Arboris.   Arboris' customers would therefore likely be easily captured by Defendants.

d.  The only other significant competitor in the Non-GMO Phytosterols Market, Cognis, does not have the capability to quickly expand production and serve Arboris' former customers' needs before Arizona could capture their business.

97.   Defendants' entry into the Non-GMO Phytosterols Market through means other than the acquisition of Arboris would likely result in a deconcentrated market or a pro-competitive effect.  In that event, there would be increased competition in the market as there would be an additional significant competitor.

98.   Conversely, with only two significant players currently competing in the Non-GMO Phytosterols Market, Defendants' entry into the market through the acquisition of Arboris, rather than through independent means, will substantially impair competition in the market.

99.     With the complete elimination of the dominant competitor, Arboris, and with a captive supply of raw material, Defendants would hold a significant advantage compared to Cognis, which has significant, arms-length raw material costs.  Conversely, with (i) no cost for raw material, (ii) an already installed capacity that almost doubles the current production volumes, (iii) very low cost for the assets acquisition, (iv) no personnel training requirements, and (v) no start-up costs, Defendants' entry into the Non-GMO Phytosterols Market by the effective acquisition of Arboris will force other competitors to enter or continue in the market on a vertically integrated basis in order to compete.

100.    Thus, this "vertical" acquisition of Arboris will not only eliminate the largest competitor in Non-GMO Phytosterols Market, it will also further increase barriers for entry into it.  Even without this threatened acquisition, the barriers to enter into the Non-GMO Phytosterols Market are extremely high.  The limited number of TOP producers and the relatively limited worldwide supply of TOP restrict the number of potential entrants into the Non-GMO Phytosterols Market.  Further, the required investment to construct an economic scale phytosterols extraction facility, not including the cost to develop the necessary intellectual property, is very high - between $60 and $75 million.

101.    Defendants' effective acquisition of Arboris violates, or threatens to violate, the Clayton Act, 15 U.S.C. § 18.  Arboris has no adequate remedy at law.  If Defendants are not preliminarily and permanently enjoined and restrained from their anticompetitive activity, Arboris, which has the largest market share in the Non-GMO Phytosterols Market, will likely be completely eliminated as an independent and effective competitor in such

32

market both currently and in the future.  Thus, competition will be substantially lessened in the Non-GMO Phytosterols Market.

102.   Arboris is therefore entitled to relief under the antitrust laws.

WHEREFORE, Arboris respectfully requests that judgment be entered declaring that Arizona, Arizona-Arboris and Marterer have violated the Clayton Act, 15 U.S.C. § 18, and

a.   preliminarily and permanently enjoining Arizona and Arizona-Arboris, and each of their officers, directors, employees and agents, and all persons acting on their behalf or in concert with them, from (i) acquiring or attempting to acquire any of Arboris' assets, (ii) exercising any purchase option contained in the Ground Lease, (iii) acquiring or exercising any ownership, control, or voting rights over Arboris, (iv) participating in any management decisions of Arboris or exercising, directly or indirectly, any influence or control on the management of Arboris, (v) transferring any rights of acquisition, ownership or control to any person without court approval, and (vi) refusing to provide Arboris access to and use of the Arboris Plant on reasonable terms and conditions;

b.   divesting Arizona-Arboris of its ownership interest or rights to acquire ownership interests in Arboris;

c.   divesting Arizona-Arboris of any purchase option contained in the Ground Lease;

d.   de-linking the term of the Ground Lease from the TOPSA;

33

    e.   pursuant to 15 U.S.C. § 15, granting Arboris (i) threefold the damages sustained as a result of the antitrust violations, (ii) punitive damages, and (iii) interest, costs and attorneys' fees in bringing this action; and

    f.   awarding Arboris such other relief as this court deems just and appropriate.

**COUNT TWO**
**Violation of Sherman Act, Section Two, 15 U.S.C.A. § 2**

103.    Arboris incorporates its allegations in paragraphs 1 through 87 and 89 through 100 above and states further as follows.

104.    Defendants, Arizona and Arizona-Arboris, have engaged in and are continuing to engage in anticompetitive conduct with the specific intent to monopolize the Non-GMO Phytosterols Market and have either achieved such monopoly power already or have a dangerous probability of achieving such monopoly power.

105.    Defendants have acquired, or intend to acquire, this monopoly power through the anticompetitive means of destroying Arboris' ability to survive as a competitor in the Non-GMO Phytosterols Market.   Defendants are taking steps to accomplish Arboris' destruction by (i) refusing to renegotiate the TOPSA, (ii) vetoing all attempts by Arboris to build an alternate plant site or to expand or diversify its phytosterols extraction business beyond the existing Arboris Plant, and (iii) ultimately exercising what amounts to an illegal option to acquire all of Arboris' phytosterols extraction plant and equipment assets in 2014.

106.    By using the threat of the acquisition of the Arboris Plant and then blocking Arboris' current attempts to ensure its survival in the event of such acquisition, Defendants

34

have clearly demonstrated their intent to monopolize, and have already to a certain extent obtained a measure of monopoly power over, the Non-GMO Phytosterols Market.

107.   Alternatively, Defendants are dangerously close to achieving monopoly power over the Non-GMO Phytosterols Market.  If Defendants' conduct is not enjoined, they will eliminate the dominant company in the Non-GMO Phytosterols Market and will easily succeed to Arboris' 60% market share position.

108.   Defendants' acquisition of monopoly power through the elimination of Arboris as a competitor will have a substantial adverse impact on competition within the Non-GMO Phytosterols Market.   Instead of adding a competitor to the market, the elimination of the dominant competitor will clearly result in greater market concentration in an already oligopolistic market.

109.   In addition to capturing a dominant market share, Defendants will be able to vertically integrate the tall oil processing business by adding the phytosterol products.  This will expand Arizona's dominance because it will be the first time that a TOP producer/supplier has entered the Non-GMO Phytosterols Market.   Arizona's vertical integration of the supply and manufacturing businesses will substantially impair competition in such market by creating even greater barriers to entry, allowing Arizona to control prices and exclude competition from the Non-GMO Phytosterols Market.

110.   Defendants will be able to maintain such monopoly power due to the high barriers to entry into the Non-GMO Phytosterols Market, including, but not limited to, (i) the limited worldwide supply of raw material (of which Arizona controls nearly half), (ii) the high start-up costs for others to erect manufacturing facilities, and (iii) the need for

specialized intellectual property/technology to even make possible a functioning phytosterols operation.

111.   All of Defendants' intentional actions, together and individually, unnecessarily exclude Arboris from competing by eliminating it as a competitor from the Non-GMO Phytosterols Market, thereby substantially impairing competition.  Defendants' conduct has no legitimate business justification and constitutes a concerted and willful attempt to monopolize, and the monopolization of, the tall oil processing industry and the Non-GMO Phytosterols Market, which is in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

112.   Arboris has suffered and will continue to suffer damages as a result of Defendants' anticompetitive conduct.

113.   In addition, Arboris has no adequate remedy at law.  If Defendants are not enjoined and restrained from their anticompetitive activity, Arboris will be completely eliminated as a competitor in the Non-GMO Phytosterols Market, thereby substantially lessening competition in that market.

114.   Arboris is therefore entitled to relief under the antitrust laws.

WHEREFORE, Arboris respectfully requests that judgment be entered declaring that Arizona, Arizona-Arboris and Marterer have violated the Sherman Act, 15 U.S.C. § 2, and

  a. preliminarily and permanently enjoining Arizona and Arizona-Arboris, and each of their officers, directors, employees and agents, and all persons acting on their behalf or in concert with them, from (i) acquiring or attempting to acquire any of Arboris' assets, (ii) exercising any purchase option contained in

the Ground Lease, (iii) acquiring or exercising any ownership, control, or voting rights over Arboris, (iv) participating in any management decisions of Arboris or exercising, directly or indirectly, any influence or control on the management of Arboris, (v) transferring any rights of acquisition, ownership or control to any person without court approval, and (vi) refusing to provide Arboris access to and use of the Arboris Plant on reasonable terms and conditions;

b. divesting Arizona-Arboris of its ownership interest or rights to acquire ownership interests in Arboris;

c. divesting Arizona-Arboris of any purchase option contained in the Ground Lease

d. de-linking the term of the Ground Lease from the TOPSA;

e. pursuant to 15 U.S.C. § 15, granting Arboris (i) threefold the damages sustained as a result of the antitrust violations, (ii) punitive damages, and (iii) interest, costs and attorneys' fees in bringing this action; and

f. awarding Arboris such other relief as this court deems just and appropriate.

## COUNT THREE
### Violation of Sherman Act, Section Two - Refusal to Deal

115.  Arboris incorporates its allegations in paragraphs 1 through 87, 89 through 100 and 104 through 112 above and states further as follows.

116.  Defendants' conduct constitutes an illegal refusal to deal with Arboris in violation of 15 U.S.C. § 2.

117.   The Arboris Plant is a facility essential to effective competition in the Non-GMO Phytosterols Market.  The Arboris Plant is highly specialized and is one of only two plants in entire world that can extract and produce TOP-derived non-GMO phytosterols. Sixty percent of all of the world's non-GMO phytosterols (80% of TOP-based) are produced by Arboris from the Arboris Plant.

118.   Defendants have taken, and intend to continue taking, action to deprive Arboris of this essential facility in an effort to monopolize the Non-GMO Phytosterols Market.  Defendants are unjustly threatening to exercise a lease termination provision and a purchase option to preclude Arboris from this essential facility and to refuse to deal with Arboris.   Specifically, Defendants have together refused to (i) engage in discussions to renew the TOPSA, (ii) de-link the Ground Lease from the TOPSA, and (iii) relinquish any purchase option contained in the Ground Lease.  This refusal to deal will deprive Arboris of the Arboris Plant and will thereby substantially diminish competition in the relevant market.

119.   Arizona-Arboris is also monopolizing, or attempting to monopolize, the Non-GMO Phytosterols Market by threatening to block, via its "veto" power, any current effort by Arboris to purchase or build an alternate plant facility prior to 2014.  While Arboris should not be required to build an alternate plant in order to survive beyond 2014, a new non-GMO phytosterols extraction facility like the Arboris Plant would have to be built, and could likely not be bought, as only one other presently exists in the world.

120.   All of Defendants' intentional actions, together and individually, unnecessarily and improperly exclude Arboris from competing by eliminating it as a competitor in the Non-GMO Phytosterols Market, thereby substantially impairing

38

competition. Defendants' conduct has no legitimate business justification and constitutes a concerted and willful attempt to monopolize, and the monopolization of, the Non-GMO Phytosterols Market, which is in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

121.    Arboris has no adequate remedy at law.  If Defendants are not preliminarily and permanently enjoined and restrained from their anticompetitive activity, Arboris will be completely eliminated as a competitor in the Non-GMO Phytosterols Market, thereby substantially lessening competition in that market.

122.    Arboris is therefore entitled to relief under the antitrust laws.

WHEREFORE, Arboris respectfully requests that judgment be entered declaring that Arizona, Arizona-Arboris and Marterer have violated the Sherman Act, 15 U.S.C. § 2, and

a.    preliminarily and permanently enjoining Arizona and Arizona-Arboris, and each of their officers, directors, employees and agents, and all persons acting on their behalf or in concert with them, from (i) acquiring or attempting to acquire any of Arboris' assets, (ii) exercising any purchase option contained in the Ground Lease, (iii) acquiring or exercising any ownership, control, or voting rights over Arboris, (iv) participating in any management decisions of Arboris or exercising, directly or indirectly, any influence or control on the management of Arboris, (v) transferring any rights of acquisition, ownership or control to any person without court approval, and (vi) refusing to provide Arboris access to and use of the Arboris Plant on reasonable terms and conditions;

b.  divesting Arizona-Arboris of its ownership interest or rights to acquire ownership interests in Arboris;

c.  divesting Arizona-Arboris of any purchase option contained in the Ground Lease;

d.  de-linking the term of the Ground Lease from the TOPSA;

e.  pursuant to 15 U.S.C. § 15, granting Arboris (i) threefold the damages sustained as a result of the antitrust violations, (ii) punitive damages, and (iii) interest, costs and attorneys' fees in bringing this action; and

f.  awarding such other relief as this court deems just and appropriate.

## COUNT FOUR
### Request for Declaratory Judgment

123.   Plaintiff incorporates its allegations in paragraphs 1 through 87 above and states further as follows.

124.   Pursuant to 28 U.S.C. § 2201, Plaintiff brings this action for declaratory judgment.  An actual controversy exists among the parties to this suit with regard to the interpretation and effect of certain contractual provisions among them. A judicial determination is necessary and appropriate at this time so that the parties may determine their rights and duties under the Operating Agreement, the TOPSA, and the Ground Lease.  All of these agreements are interlinked and cannot be interpreted in isolation from one another. Plaintiff respectfully asks this Court to declare the respective rights of the parties with regard to these agreements and disputes.  In support of this action, Plaintiff states further as follows.

125.   On June 5, 2001, Arboris was formed as a joint venture whose members were Arboris Roots and Arizona-Arboris.

126.   From its inception, the members intended that Arboris' business proceed for a period of at least 30 years.

127.   On July 30, 2002, several agreements were executed in relation to the joint venture, including, but not limited to, the Contribution Agreement, the Operating Agreement, the Ground Lease, and the TOPSA.

The Contribution Agreement

128.   The Contribution Agreement was executed by Arboris and its members, Arizona-Arboris and Arboris Roots.  It provided for the contributions that would be made to the joint venture by the respective members and the agreements that Arboris would enter into as a part of the joint venture, including, but not limited to, the Operating Agreement, the Ground Lease, and the TOPSA.

The Operating Agreement

129.   The Operating Agreement provided that Arboris' business purpose was the "ownership and operation of a phytosterols extraction and purification plant located in Savannah, Georgia and the sale and supply of phytosterols and Arboris Non Sterol Materials (as defined in the Supply and Processing Agreement dated the date hereof between Arizona Chemical Company . . . and the Company) generated from the processing of tall oil pitch, together with such other activities directly related to the foregoing business as may be necessary or advisable in the reasonable opinion of the Managers to further the foregoing business (collectively, the "Business")."

41

130.    The Operating Agreement mandates that this business purpose was to be carried out for a period of 30 years.

131.    The only way for the Arboris joint venture to terminate earlier than 30 years was either upon an earlier vote of the members to dissolve Arboris or an earlier judicial dissolution. Neither of these events has occurred.

<u>The Ground Lease</u>

132.    At the time the Operating Agreement was executed, Arboris had no existing plant with which to process phytosterols. The Arboris plant was to be built on vacant land owned by Arizona. In that regard, at the same time the Operating Agreement was executed, Arboris also entered into the Ground Lease with Arizona-Arboris (Arboris' 10% owner).

133.    Consistent with the Operating Agreement, the Ground Lease also had a term of 30 years. Under these agreements, Arboris had a contractual right and expectation that its business would proceed for a period of 30 years.

<u>The TOPSA</u>

134.    The Operating Agreement referenced and attached the TOPSA, an agreement between Arboris and Arizona under which Arizona would exclusively supply the joint venture with all of its TOP needs.

135.    Although the Operating Agreement expressly requires that the joint venture will proceed for 30 years, the TOPSA has an "initial" term of just 10 years. However, the TOPSA calls for its renewal, upon mutually agreeable terms, at least 2 years prior to the end of the initial term. The reason that the initial term of the TOPSA was shorter than that of the

Ground Lease and the Operating Agreement was to permit the parties to renegotiate and reset the price to be paid for TOP in order to keep it relative to market prices and conditions.

136.   The shorter term of the TOPSA was never intended as a mechanism for Arizona to arbitrarily alter the term of the Ground Lease or to otherwise shorten the joint venture from 30 years to just 10 years.

Arboris Builds its Plant Based Upon a 30 Year Term

137.   Based upon the agreed 30 year duration of the joint venture and assurance of a reliable source of raw material, Arboris' 90% member, Arboris Roots, proceeded to finance the entire $65 million start-up cost to build the Arboris Plant on the vacant land owned by Arizona.  Arizona and Arizona-Arboris financed no portion of these start-up costs and have made only negligible financial contributions to Arboris.

Defendants Assert an Unjustified Contractual Position

138.   Now that Arboris has become dependent upon Arizona, both for its raw material supply and for access to its own plant facility, in bad faith Defendants are now asserting an interpretation of the TOPSA and the Ground Lease that is nonsensical, unjust, and contrary to their intent and purpose.  They are doing so for the improper purpose of eliminating Arboris altogether and capturing its entire business for themselves.

139.   Under their interpretation, Defendants contend that they have the right to destroy Arboris just 10 years after becoming operational, effectively truncating the intended 30 year duration of the joint venture (as defined by the Operating Agreement) by 20 years. Such an interpretation essentially allows Defendants to eliminate Arboris and take over the business in 2014.

43

140.    For this proposition, Arizona unreasonably relies on a provision in the Ground Lease that states that its 30 year term can terminate early upon expiration or termination of the TOPSA.  By tying the early termination language of the Ground Lease to the duration of the initial term of the TOPSA, Arizona claims that Arizona-Arboris has the right to truncate the Ground Lease from 30 years to 10 years and to oust Arboris from its $65 million facility in 2014.  Moreover, Defendants contend that because the Ground Lease contains a provision allowing the landlord, Arizona-Arboris, a discretionary option upon termination to purchase all of the improvements made upon Arizona's land for their depreciated value, in 2014, Arizona-Arboris contends that it can, in addition to denying Arboris access to its plant, acquire the entire Arboris Plant for negligible cost.

141.    Defendants' interpretation of these agreements is unreasonable, is contrary to their intent and purpose, and violates the intent and purpose of the 30-year joint venture. The Operating Agreement mandates that the Arboris joint venture is to proceed in the business of operating the phytosterols extraction and processing facility in Savannah, Georgia *for a period of 30 years*, not 10 years.

142.    Further, Defendants' position that the purchase option would entitle them to acquire Arboris' proprietary and confidential trade fixtures would be contrary to the limited license and confidentiality requirements of the Contract Operations Agreement and applicable trade secrets law and would effectively allow the unlicensed use of the Arboris Technology.

143.    Defendants' interpretation would result in the unfair destruction of Arboris just 10 years from becoming operational, in clear violation of the Operating Agreement and

the confidentiality provisions of the Contract Operations Agreement. This would deny Arboris its legitimate contractual expectations of proceeding in its business for 30 years and maintaining the confidentiality of its intellectual property and technology.

144.    Defendants' interpretation is nonsensical and would lead to unintended and unconscionable results. It would unjustly enrich Defendants, who claim to have the right to obtain, for negligible cost, a fully functioning phytosterols plant that cost $65 million to build. Moreover, if unchecked, for essentially no cost Defendants would (i) unjustly eliminate all competition from Arboris in the Non-GMO Phytosterols Market, (ii) succeed in taking over a multi-million dollar a year business and revenue stream from Arboris, and (iii) obtain Arboris' dominant 60% market share in the Non-GMO Phytosterols Market.

145.    This result is not the intent of the Arboris joint venture or the agreements executed in relation to it.

WHEREFORE, Arboris respectfully requests a declaration of Arboris' rights under the Operating Agreement, the TOPSA, and the Ground Lease, including a declaration from the Court that de-links the Ground Lease from the TOPSA such that, if Arizona refuses to renew the TOPSA or the TOPSA otherwise expires prior to the end of the term of the Operating Agreement, Arizona-Arboris does not have the right to terminate the Ground Lease or to exercise any purchase option contained in the Ground Lease.

Alternatively, Arboris respectfully requests a declaration from the Court that the TOPSA term provision and the Ground Lease early termination provision as it relates to the TOPSA are void as a matter of law because they are inconsistent with the Operating Agreement and inconsistent with the intent and purpose of the Arboris joint venture.

45

Arboris further respectfully requests a declaration that the purchase option in the Ground Lease does not allow the acquisition of Arboris' confidential and proprietary trade fixtures.

## COUNT FIVE
### Breach of the TOPSA and the Ground Lease

146.   Plaintiff incorporates its allegations in paragraphs 1 through 87 and 125 through 145 above and states further as follows.

147.   The Operating Agreement, to which Arizona-Arboris is a party, mandates that the Arboris joint venture proceed for a period of 30 years.

148.   The Operating Agreement references and attaches the TOPSA and the Ground Lease.  Marterer executed the TOPSA on behalf of Arizona, and he simultaneously executed the Operating Agreement and the Ground Lease on behalf of Arizona-Arboris.  All three agreements were simultaneously executed, are interlinked, and must be read in conjunction with one another to determine their overall intent, purpose, and meaning.

149.   The expressly stated intent in the Operating Agreement is that the Arboris joint venture shall continue for a period of 30 years.

150.   The term of the Ground Lease corresponds with this intent, also having a term of 30 years.

151.   While the TOPSA's initial term was shorter than that of the Ground Lease (10 years versus 30 years), it calls for its renewal at least 2 years prior to the end of the initial term on mutually agreeable terms.  The purpose of the shorter term of the TOPSA was

simply to allow the parties to renegotiate the price paid for TOP in accordance with market conditions.

152.   The early termination provision in the Ground Lease was not intended to affect or alter the 30 year duration of the joint venture or allow a termination of the Ground Lease without cause.  It was not the intent of the parties under the Ground Lease that Arizona-Arboris could terminate it and acquire the Arboris Plant in the event that Arizona arbitrarily refused to renegotiate and renew the TOPSA.

153.   Arizona has a contractual duty under the TOPSA to engage in good faith negotiations to renew the TOPSA and cannot unreasonably or unjustifiably refuse to renegotiate and renew it on commercially reasonable terms.

154.   Arizona and Arizona-Arboris are now taking the unjustified position that Arizona can arbitrarily refuse to renew the TOPSA.  Thereafter, Defendants contend that Arizona-Arboris can terminated the Ground Lease, shortening its term to only 10 years, and acquire all of the improvements built upon Arizona's land.  In other words, Defendants now take the incredible position that they can acquire the entire Arboris Plant, all of Arboris' phytosterol extraction  assets, not as a result of any breach Arboris but simply by Arizona's refusal to renew the TOPSA.  Defendants' unreasonable interpretation would achieve unconscionable results.  For negligible cost, Defendants would effectively acquire a $50 to 65 million a year business and its $65 million facility, while simultaneously eliminating all competition from the dominant competitor in the market.

155.   By taking this unjustified position, Defendants are repudiating and in breach of (i) the intent and purpose of the TOPSA and the Ground Lease, (ii) their respective

obligations thereunder, and (iii) the covenant of good faith and fair dealing. Defendants are unfairly frustrating the contracts' purposes, disappointing Arboris' contractual expectations, and depriving Arboris of the contracts' benefits.

156.   Defendants' breaches are currently causing damage to Arboris and will continue to cause significant damages to Arboris in the future.

157.   Arboris has demanded, among other things that (i) Arizona immediately engage in negotiations to renew the TOPSA and (ii) Arizona and Arizona-Arboris agree, in writing, to de-link the Ground Lease term from the TOPSA term.   Arboris has notified Defendants repeatedly that their actions are placing Arboris' survival in jeopardy and are currently preventing Arboris from making long term commitments to its customers.

158.   Damages alone may not be sufficient to remedy Defendants' course of conduct and Arboris may suffer irreparable harm.   Thus, in addition to damages, Arboris seeks injunctive relief to enjoin Defendants from their course of action.

WHEREFORE, Arboris demands judgment against Arizona, Arizona-Arboris and Marterer, jointly and severally, for (i) temporary and permanent injunctive relief, (ii) declaratory relief, (iii) damages plus interest, costs, attorneys' fees, and (iv) such other relief as the Court deems just and appropriate.

## COUNT SIX
### Breach of Fiduciary Duty

159.   Plaintiff incorporates its allegations in paragraphs 1 through 87 above and states further as follows.

160.   Arizona-Arboris is a member and minority owner of Arboris and owes Arboris a fiduciary duty of utmost loyalty.

161.   At all material times, Marterer was President and CEO of Arizona-Arboris and a member of the board of directors of Arizona.  Marterer was also a member of Arboris' Board of Managers and owed a duty of utmost loyalty to Arboris.

162.   Arizona-Arboris and Marterer, acting at the direction of and in concert with Arizona, breached their fiduciary duties to Arboris to benefit themselves and Arizona to the detriment of Arboris.

163.   Arizona-Arboris unfairly intends, and threatens, to terminate the Ground Lease in 2014 and simultaneously exercise an asserted purchase option under the Ground Lease.  By taking this position, Arizona-Arboris intends to effectively destroy Arboris and allow its parent company to succeed to Arboris' position in the Non-GMO Phytosterols Market, all for negligible cost.

164.   In light of Arizona-Arboris' threats to attempt to exercise a purchase option under the Ground Lease in 2014, Arboris undertook to diversify its plant holdings and product offerings so that it would not be entirely dependent upon the Arboris Plant facility.

165.   In violation of its fiduciary duties to Arboris, Arizona-Arboris has unjustifiably used its "veto" right under the Operating Agreement to the detriment of Arboris in order to effectuate Arizona's plan to cut off Arboris' supply and acquire its plant for negligible cost.  Arizona-Arboris has unreasonably (i) vowed to veto any attempt to build an alternate plant, (ii) vetoed a potentially lucrative deal for Arboris to purchase a competitor and obtain an alternate facility, and (iii) vetoed efforts to diversify its product offerings

49

beyond phytosterols. In so doing, Arizona-Arboris has wrongfully placed its interests and the interests of its parent, Arizona, ahead of the interests of Arboris.

166.    Further, the actions by Arizona-Arboris and Marterer to misappropriate the Arboris Technology is a direct violation of their fiduciary duties to Arboris.

167.    Arboris has suffered, and will continue to suffer, significant damages from these Defendants' respective breaches of their fiduciary duties, including, but not limited to, multiple millions of dollars in future lost revenues and profits.

168.    The legal remedy of damages may not be sufficient in these circumstances to remedy Arizona-Arboris and Marterer's improper conduct. If these Defendants are not enjoined from their improper conduct, Arboris will suffer irreparable harm.

WHEREFORE, Arboris demands judgment against Arizona-Arboris and Marterer for (i) permanent injunctive relief, (ii) damages plus interest, costs, attorneys' fees, (iii) a declaration that Arizona-Arboris and Marterer have breached their fiduciary duties to Arboris, and (iv) such other relief as the Court deems just and appropriate.

## COUNT SEVEN
### Misappropriation of Trade Secrets - Chapter 688, Florida Statutes

169.    Plaintiff incorporates its allegations in paragraphs 1 through 87 above and states further as follows.

170.    During the term of the Contract Operations Agreement and Contract Services Agreement, Defendants had access to Arboris' trade secrets (as such term is defined by Section 688.002(4), Florida Statutes), including information concerning the Arboris Technology. The Arboris Technology consists of complex technical information, including,

but not limited to, certain proprietary chemical formulas, compilations, methods, techniques, know-how, and patents, that derives economic benefit because the information is (i) not generally known to other persons, (ii) not readily ascertainable by proper means, and (iii) the subject of efforts to maintain its secrecy which are reasonable under the circumstances.

171.   Arboris, at all relevant times, undertook reasonable steps to safeguard its trade secrets and other confidential and proprietary information.   Arboris entered into an agreement prohibiting competition by Defendants and also required Defendants to contractually agree to keep all information confidential.  Arboris did not reveal information beyond that necessary for the success of the joint venture.  Arboris took reasonable efforts to maintain the secrecy and confidentiality of this proprietary information by, among other things, including confidentiality and non-competition provisions in its required contracts.

172.   Defendants knew that their knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.  At all relevant times, Defendants knew that (i) the Arboris Technology was confidential, (ii) they had a duty to keep it confidential, (iii) they had a duty not to use it for their own purposes, and (iv) they had a duty to use it solely in the furtherance of Arboris' business.

173.   Defendants have violated, and are continuing to violate, the Florida Uniform Trade Secret Act by maliciously misappropriating Arboris' trade secrets (as defined in Section 688.002(2), Florida Statutes), without consent and in preparation for using Arboris' trade secrets in a competing business.  Arboris did not permit Defendants' access to the Arboris Technology for the purpose of allowing Defendants to usurp it, misappropriate it, infringe upon it, reverse engineer it, work around it, or do anything but use it for the benefit

of Arboris for the purposes of fulfilling the agreements between the parties and furthering Arboris' business.

174.   Defendants have each, individually and together in conspiracy, misappropriated the Arboris Technology for their own benefit and are threatening to continue to misappropriate the Arboris Technology in the future.

175.   Arboris is entitled to injunctive relief to prohibit Defendants' continued use and disclosure of Arboris' trade secrets pursuant to Florida's Uniform Trade Secrets Act, Section 688.001, *et seq.*, Florida Statutes, which permits injunctive relief to redress any actual or threatened misappropriation of trade secrets.

176.   As a direct and proximate result of Defendants' unauthorized misappropriation of Arboris' trade secrets, Arboris has suffered, and will continue to suffer, significant damages, including, but not limited to, multiple millions of dollars in future lost revenues and profits.

177.   The legal remedy of damages may not be sufficient in these circumstances to remedy Defendants' misappropriation.  If Defendants are not enjoined from misappropriating the Arboris Technology, Arboris will suffer irreparable harm.

WHEREFORE, Arboris demands judgment against Arizona, Arizona-Arboris and Marterer, jointly and severally, (i) declaring that Defendants have violated Florida's Uniform Trade Secrets Act, (ii) granting permanent injunctive relief, (iii) awarding damages plus interest, costs, attorneys' fees pursuant to Section 688.005, Florida Statutes, and (iv) such other relief as the Court deems just and appropriate.

## COUNT EIGHT
### Violation of the Florida Unfair and
### Deceptive Trade Practices Act, Section 501.201, *et seq.* Florida Statutes

178.   Plaintiff incorporates its allegations in paragraphs 1 through 87 and states further as follows.

179.   Arizona produces and distributes chemicals derived from pine trees, including TOP, and is engaged in trade or commerce (as such terms are defined in Section 501.203(8), Florida Statutes).   Arboris is a consumer of Arizona's TOP and buys all of its TOP requirements from Arizona.   Arboris is not, and has not ever been, engaged in the sale of TOP.

180.   Arizona, Arizona-Arboris, and Marterer together have engaged in unfair, deceptive, and anticompetitive conduct in violation of Florida's Unfair and Deceptive Trade Practices Act, Section 501.201, *et. seq.*, Florida Statutes, in relation to their trade with Arboris, including, but not limited to, their dealings under the Operating Agreement, the Contract Operations Agreement, the TOPSA, and the Ground Lease.   Defendants' relationship with Arboris was initiated in Florida.   Their contracts relating to Arboris were negotiated and consummated in Florida.   The parties to these contracts all have their primary places of business in Jacksonville, Florida.   The parties chose Florida law to govern their business disputes relating to these contracts and also specified the venue for disputes among them to be in Jacksonville, Florida.

181.   Under the guise of a long term "joint venture" and through deception and false pretenses, Defendants have used Arboris merely as a vehicle to misappropriate Arboris'

53

intellectual property, capture the fruits of Arboris' labor, and monopolize the Non-GMO Phytosterols Market.

182.    Marterer has expressed to former Arizona insiders that it was Defendants' intent to starve Arboris of its supply of TOP and to take over its business.

183.    In furtherance of Defendants' plan, Defendants have employed deceptive and unfair practices, including, but not limited to, preventing Arboris from undertaking reasonable efforts to ensure its survival and continue as a viable ongoing concern in the Non-GMO Phytosterols Market.  Arboris has suffered, and will continue to suffer, significant damages from Defendants' deceptive, unfair conduct, including, but not limited to, multiple millions of dollars in future lost revenues and profits.

184.    The legal remedy of damages may not be sufficient in these circumstances to remedy Defendants' improper conduct.  If Defendants are not enjoined from their unfair and deceptive trade practices, Arboris will suffer irreparable harm.

WHEREFORE, Arboris demands judgment against Arizona, Arizona-Arboris and Marterer, jointly and severally, for (i) permanent injunctive relief, (ii) declaratory relief, (iii) damages plus interest, costs, attorneys' fees, and (iv) such other relief as the Court deems just and appropriate.

## COUNT NINE
### Breach of the Operating Agreement

185.    Plaintiff incorporates its allegations in paragraphs 1 through 87 above and states further as follows.

186.    Arboris,  Arizona-Arboris,  and  Arizona  are  parties  to  the  Operating Agreement.

187.    Under Section 3.8 of the Operating Agreement, Arizona-Arboris and Arizona agreed not to compete with Arboris in its business of extracting, purifying, and selling phytosterols.

188.    In breach of this covenant, Arizona-Arboris and Arizona have taken action, and are continuing to take action, that competes with Arboris in this business.  Arizona-Arboris and Arizona are not only currently establishing and promoting a competing phytosterols business of their own, but in doing so they are acting to destroy Arboris' future viability.

189.    Arizona-Arboris'  and  Arizona's  competitive  conduct  includes  (i) misappropriating the Arboris Technology, (ii) unjustly refusing to renew the TOPSA, (iii) threatening to oust Arboris from its plant, and (iv) vetoing Arboris' attempts to establish an alternate plant facility.

190.    Arboris  has  suffered,  and  will  continue  to  suffer,  damages  from  these breaches.  Arboris is currently paralyzed with respect to long-term business planning and is unable to make future commitments without the ability to obtain a supply of TOP or to have a facility within which to process it.  Arboris will also suffer significant damages in the future, including, but not limited to, multiple millions of dollars in future lost revenues and profits.

191.   The legal remedy of damages may not be sufficient in these circumstances to remedy Arizona-Arboris' improper conduct.   If Arizona-Arboris is not enjoined from its current competitive conduct, Arboris will suffer irreparable harm.

WHEREFORE, Arboris demands judgment against Arizona and Arizona-Arboris, jointly and severally, for (i) permanent injunctive relief, (ii) declaratory relief, (iii) damages plus interest, costs, attorneys' fees as provided in the contracts, and (iv) such other relief as the Court deems just and appropriate.

## COUNT TEN
## Fraud in the Inducement

192.   Plaintiff incorporates its allegations in paragraphs 1 through 87 above and states further as follows.

193.   Arizona-Arboris is an owner of Arboris and has a fiduciary duty of utmost loyalty to Arboris.  Marterer, a member of Arboris' Board of Managers, also had a fiduciary duty of loyalty to Arboris.

194.   Prior to the time Arboris entered into the Arboris Agreements, Arizona-Arboris represented to Arboris that (i) it intended the Arboris venture to be long term, lasting for a period of at least 30 years, (ii) its parent, Arizona, would supply Arboris' TOP needs during the term of the venture, (iii) it would provide a Ground Lease that would last for 30 years, on which property Arboris could build a phytosterols extraction and processing facility, and (iv) Arizona and Arizona-Arboris would keep the Arboris Technology confidential and would not use it except in the furtherance of Arboris' business.

56

195.    Arizona-Arboris and Marterer, who had a fiduciary obligation of loyalty to Arboris, never discussed with Arboris the position Arizona-Arboris is now taking - that they intended to (i) terminate the Ground Lease, and thereby the entire venture in 2014 if Arizona decided to cut off Arboris' supply of TOP and (ii) attempt to acquire for negligible cost all of Arboris' assets.    This was a violation of Arizona-Arboris' and Marterer's fiduciary obligations to Arboris.

196.    In good faith reliance on its fiduciaries' affirmative representations about the long term, 30 year nature of the venture and their silence with regard to Arizona-Arboris' currently asserted position regarding termination of the Ground Lease in 2014, Arboris (i) entered into the Ground Lease, the TOPSA, and all of the other Arboris Agreements and (ii) was induced to spend $65 million to build a state-of-the art phytosterols extraction and processing plant on Arizona's property.

197.    Likewise, Arboris entered into the Arboris Agreements, including the Contract Operations Agreement, in good faith reliance on Defendants' commitment and representations that Arizona-Arboris and Arizona would not use the Arboris Technology for their own benefit or the benefit of others.    Indeed, the only lacking critical component that prevented Arizona-Arboris from entering the phytosterols business itself was the technology that Arboris had.    But for Arizona-Arboris' representations of confidentiality and limited use of the Arboris Technology, Arboris would never have entered into the Arboris Agreements or proceeded in any joint venture of any form with Defendants.

198.    Defendants made these representations knowing them to be false at the time they made them and did so for the purpose of inducing Arboris to enter into the Arboris Agreements.

199.    Contrary to their representations, Defendants never intended to proceed with the Arboris joint venture for 30 years.   Instead, Defendants intended to (i) take the unreasonable position that they could arbitrarily terminate the Ground Lease and the Arboris joint venture in only 10 years, and (ii) misappropriate the Arboris Technology.

200.    But for Defendants' intentional misrepresentations, Arboris would not have entered into any of the Arboris Agreements nor disclosed its valuable intellectual property.

201.    Arboris has suffered, and will continue to suffer, significant damages from Defendants' fraudulent conduct, including, but not limited to, multiple millions of dollars in future lost revenues and profits.

202.    The legal remedy of damages may not be sufficient in these circumstances to remedy Defendants' improper conduct.   If Defendants are not enjoined from their misconduct, Arboris will suffer irreparable harm.

WHEREFORE, Arboris demands judgment against Arizona, Arizona-Arboris and Marterer for (i) permanent injunctive relief, (ii) declaratory relief, (iii) damages and/or rescission of the Arboris Agreements, plus interest, costs, attorneys' fees, and (iv) such other relief as the Court deems just and appropriate.

## COUNT ELEVEN
### Constructive Fraud

203.    Plaintiff incorporates its allegations in paragraphs 1 through 87, 160 through 167, and 193 through 201 above and states further as follows.

204.    Arizona-Arboris, as an owner of Arboris, and Marterer, as a member of Arboris' Board of Managers, owed a fiduciary duty to Arboris.  Arboris reposed trust and confidence in Arizona-Arboris and Marterer not to take advantage of Arboris for their own benefit or for the benefit of others, not to compete with Arboris, and not to misappropriate the Arboris Technology.

205.    Arizona-Arboris and Marterer, together with the assistance of Arizona, have knowingly and intentionally abused the trust and confidence reposed in them to their own advantage and to the detriment of Arboris.

206.    Arboris has suffered, and will continue to suffer, significant damages from Defendants' abuse of trust, including, but not limited to, multiple millions of dollars in future lost revenues and profits.

207.    The legal remedy of damages may not be sufficient in these circumstances to remedy Defendants' improper conduct.   If Defendants are not enjoined from their misconduct, Arboris will suffer irreparable harm.

WHEREFORE, Arboris demands judgment against Arizona, Arizona-Arboris and Marterer for (i) permanent injunctive relief, (ii) declaratory relief, (iii) damages plus interest, costs, attorneys' fees, and (iv) such other relief as the Court deems just and appropriate.

**VOLPE, BAJALIA, WICKES,**
**ROGERSON & WACHS, P.A.**

/s/Michael L. Duncan
Timothy W. Volpe
Florida Bar No.  358185
Michael L. Duncan
Florida Bar No. 50946
Matthew P. McLauchlin
Florida Bar No.  484180
501 Riverside Avenue, 7th Floor
Jacksonville, Florida  32202
Telephone (904) 355-1700
Facsimile (904) 355-1797

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th day of April, 2010, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to received electronically Notices of Electronic Filing.

/s/Michael L. Duncan
Michael L. Duncan

Michael A. Abel, Esq.
Holland & Knight, LLP
50 North Laura Street, Suite 3900
Jacksonville, FL 32202

1824.00400/171